**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

JAMES DAVIS BENNETT,
*Defendant-Appellant.*

No. 06-50580

D.C. No.
CR-03-00025-AHS

OPINION

Appeal from the United States District Court
for the Central District of California
Alicemarie H. Stotler, Senior District Judge, Presiding

Argued and Submitted
February 1, 2010—Pasadena, California

Filed September 10, 2010

Before: Andrew J. Kleinfeld, Kim McLane Wardlaw and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Wardlaw;
Dissent by Judge Callahan

13915

## COUNSEL

Phillip A. Trevino of the Law Offices of Phillip Trevino (Los Angeles, California) for the appellant.

George S. Cardona, Robb C. Adkins, and Brett A. Sagel of the Office of the United States Attorney's Office (Santa Ana, California) and Curtis Kin of the United States Attorney's Office (Los Angeles, California) for the appellee.

## OPINION

WARDLAW, Circuit Judge:

It is a federal crime knowingly to execute, or attempt to execute, a scheme or artifice "(1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344. "Financial institution" is defined, as relevant to this appeal, as any bank or savings association the deposits of which are insured by the Federal Deposit Insurance Corporation ("FDIC"). *See* 18 U.S.C. § 20(1); 12 U.S.C. § 1813(c)(2). James Bennett challenges the sufficiency of the evidence supporting his convictions on three counts of a twelve-count superseding indictment charging him with bank fraud under § 1344. These three counts arise from mortgages that Bennett fraudulently procured from Equicredit Corporation, a wholly-owned subsidiary of Bank of America ("BOA"). Although Equicredit is not a "financial institution," BOA is. We must decide whether, viewing the evidence in the light most favorable to the prosecution, any rational juror could have found beyond a reasonable doubt that Bennett procured funds "owned by" a "financial institution."

## I.  BACKGROUND

James Bennett — a mortgage broker, real estate appraiser, and escrow agent — operated a sophisticated property flipping scheme in Southern California. "A fraudulent property flip is a scheme in which individuals, businesses, and/or straw borrowers buy and sell properties among themselves to artificially inflate the value of the property." Fed. Fin. Inst. Examination Council, The Detection and Deterrence of Mortgage Fraud Against Financial Institutions 36 (Apr. 2010) ("FFIEC Report"). A Federal Bureau of Investigation report explains:

> Property flipping is best described as purchasing properties and artificially inflating their value through false appraisals. The artificially valued properties are then repurchased several times for a higher price by associates of the "flipper." After three or four sham sales, the properties are foreclosed on by victim lenders. Often flipped properties are ultimately repurchased for 50 to 100 percent of their original value.

Financial Crimes Section, F.B.I., Financial Crimes Report to the Public (FY 2007). "This scheme is designed to extract as much cash as possible from the property, and the loan proceeds are often used for purposes not stated on the application." FFIEC Report at 36.

Bennett identified multi-unit buildings that were listed for sale in low-income neighborhoods in Los Angeles and Long Beach. He provided his family members with cash to purchase the properties at their listed market price. He then identified "straw purchasers" to repurchase the same properties from his family members at drastically inflated prices. Sometimes, the straw purchasers were Bennett's associates or family members, and at other times, they were unwitting participants who were lured into the transactions by lucrative

incentives, such as cash rebates and zero-money-down mortgages.

Bennett facilitated the sale of the properties from the initial buyers to the straw purchasers. He began by appraising the properties at 30% to 50% above their fair market value. Then, acting as the mortgage broker, he helped the straw purchasers obtain mortgages in the amounts of the inflated property values. The documents that he submitted to various lending institutions to acquire the mortgages were replete with misrepresentations about the properties and the borrowers. Not only did he inflate the appraised value of the properties, but he also misrepresented their potential rental income and fabricated grant deeds and title reports to conceal his family members' involvement with the properties. He also submitted false information about the borrowers' employment statuses and incomes so that they would qualify for mortgages that otherwise would be denied. Finally, acting as the escrow agent, Bennett used falsified copies of cashier's checks and deposit forms to represent that deposits had been made to escrow accounts, when, in fact, they had not.

Bennett ensnared several lending institutions in his web of lies. Provided with false information about the properties and borrowers, these institutions were duped into issuing mortgages to the straw purchasers. Bennett profited in an amount equal to the difference between the mortgage proceeds fraudulently obtained from the lender and the amount paid in cash to acquire the property at its market price. Meanwhile, many of the straw purchasers defaulted on their mortgages, typically within months of the transaction, leaving the lenders to foreclose on the properties at a loss.

Equicredit was one of Bennett's victims. Three undisputed facts about Equicredit are central to Bennett's appeal. First, Equicredit is not a "financial institution" within the meaning of the bank fraud statute. The government did not introduce evidence that Equicredit was FDIC-insured or otherwise met

the statutory definition of "financial institution," nor does the government argue that Equicredit is a "financial institution" on appeal. Second, Equicredit was, at all relevant times, a wholly-owned subsidiary of BOA. Christine Costamagna, a BOA vice president and assistant corporate secretary, and Milton Chadwick, a BOA attorney, testified that BOA owned all Equicredit stock at all times relevant to the charges against Bennett. The government also introduced corporate documents establishing that Equicredit was BOA's wholly-owned subsidiary. Third, BOA is a "financial institution" because it is FDIC-insured. The government introduced a certificate of BOA's FDIC insurance coverage, and Bennett does not dispute that BOA is a "financial institution." In January 2003, a federal grand jury returned an indictment against Bennett and several of his associates for "execut[ing] a scheme to defraud mortgage lenders and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises." In September 2005, the grand jury returned a superseding twelve-count indictment against Bennett only. The indictment charged Bennett with four counts of wire fraud under 18 U.S.C. §§ 2(b) and 1343 and seven counts of bank fraud under 18 U.S.C. § 1344. Each of the wire fraud and bank fraud counts involved a different mortgage for a different property in Southern California. The twelfth count of the superseding indictment charged Bennett with operating a continuing financial crimes enterprise in violation of 18 U.S.C. § 225.

In January 2006, a jury convicted Bennett on all twelve counts. Bennett moved for judgment of acquittal, which was granted as to the twelfth count because the government failed to introduce evidence that Bennett received $5 million or more from the enterprise, as required by statute. *See* 18 U.S.C. § 225(a)(2). The district court denied Bennett's motion for judgment of acquittal as to all other counts.

Bennett appeals only his convictions as to counts eight through ten, which charged him with bank fraud arising out

of mortgages obtained from Equicredit on three different properties in Long Beach; Bennett does not contest his convictions or sentence on counts one through seven or count eleven. The sole issue raised on appeal is whether the government presented sufficient evidence from which any rational juror could find beyond a reasonable doubt that the "financial institution" element of the bank fraud statute was satisfied in circumstances where the fraudulently obtained mortgages were loaned by Equicredit, a wholly-owned subsidiary of a "financial institution."

## II.   JURISDICTION AND STANDARD OF REVIEW

The district court exercised jurisdiction pursuant to 18 U.S.C. § 3231, and we have jurisdiction over a final judgment pursuant to 28 U.S.C. § 1291. We review de novo a claim challenging the sufficiency of the evidence supporting an element of an offense. *See United States v. Sullivan*, 522 F.3d 967, 974 (9th Cir. 2008). A claim of insufficient evidence fails if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Under *Jackson*, "[w]e begin by viewing the evidence produced at trial in the light most favorable to the prosecution." *United States v. Nevils*, 598 F.3d 1158, 1169 (9th Cir. 2010) (en banc). Then, "[m]oving to the second step of *Jackson*, we must consider whether the evidence, as construed above, is sufficient to allow any rational juror to conclude that the government has carried its burden of proof." *Id.*

## III.   DISCUSSION

**[1]** Enacted as part of the Comprehensive Crime Control Act of 1984, Pub. L. No. 98-473, Title II, § 1108(a), the federal bank fraud statute makes it a federal crime knowingly to execute, or attempt to execute, a scheme or artifice "(1) to defraud a financial institution; or (2) to obtain any of the mon-

eys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344. The statute is "designed to provide an effective vehicle for the prosecution of frauds in which the victims are financial institutions." S. Rep. No. 98-225, at 377 (1983). "Financial institution" is defined to include any bank or savings association the deposits of which are insured by the FDIC. *See* 18 U.S.C. § 20(1) (cross-referencing the definition of "insured depository institution" in 12 U.S.C. § 1813(c)(2)). By criminalizing frauds perpetrated against FDIC-insured banks, the statute furthers "[the] strong federal interest in protecting the financial integrity of these institutions." S. Rep. No. 98-225, at 377.

**[2]** The government concedes that Bennett's fraud was perpetrated against Equicredit and that Equicredit does not meet the statutory definition of "financial institution." Therefore, the government does not argue that § 1344(1) applies (i.e., that Bennett "defraud[ed] a financial institution"). Instead, it argues that Bennett fraudulently obtained funds "owned by" a financial institution for purposes of § 1344(2). The government contends that, as a matter of law, a parent corporation "owns" the assets of its wholly-owned subsidiary, and therefore that Bennett fraudulently obtained assets "owned by" BOA, a financial institution, when he obtained mortgages from Equicredit.[1]

More than a century of corporate law says otherwise. *See, e.g.*, *Wells v. Dane*, 63 A. 324, 325 (Me. 1905) ("The plaintiff was not the corporation, notwithstanding he owned and controlled a majority of its stock. He did not own or control its property . . . ."); *Huber v. Martin*, 105 N.W. 1031, 1037 (Wis.

---

[1]When pressed at oral argument, the government insisted repeatedly that the government was proceeding only under the "ownership" aspect of § 1344(2), and it disavowed any contention that Bennett's conviction might be upheld under the "custody or control" aspect of § 1344(2).

1906) ("Where is the ownership of the net assets of a mutual insurance company located? That the legal title is in the corporation goes without saying."). As early as 1926, the Supreme Court recognized that "[t]he owner of the shares of stock in a company is not the owner of the corporation's property." *R.I. Hosp. Trust Co. v. Doughton*, 270 U.S. 69, 81 (1926). While the shareholder has a right to share in corporate dividends, "he does not own the corporate property." *Id.*

This principle was followed by the states as corporate law developed. In 1941, the California Supreme Court declared that it was "fundamental, of course, that the corporation has a personality distinct from that of its shareholders, and that the latter neither own the corporate property nor the corporate earnings." *Miller v. McColgan*, 110 P.2d 419, 421 (Cal. 1941). In 1959, the Delaware Supreme Court rejected an argument — much like that presented here — that a parent corporation owns its wholly-owned subsidiary's assets. *See Buechner v. Farbenfabriken Bayer AG*, 154 A.2d 684, 686 (Del. 1959). In affirming the denial of the plaintiff's motion to seize the property of the defendant corporation's wholly-owned subsidiary, the *Buechner* court explained that the parent company "has no interest of any specific assets of the [wholly-owned subsidiary]" because "[t]he corporation is an entity, distinct from its stockholders even if the subsidiary's stock is wholly owned by one person or corporation." *Id.* at 686-87; *see also Finley v. Kanter*, 53 So. 2d 347, 349-50 (Ala. 1950) ("A corporation is a distinct legal entity, separate and distinct from its shareholders and officers, and the property representing the capital of the corporation is vested in and owned by the corporation. This general doctrine is well established and obtains both at law and in equity."); *Am. State Bank v. Jones*, 239 N.W. 144, 146 (Minn. 1931) ("It is difficult to see how the taking over of the property of the bank deprives [the shareholder] of any property. He had no title to, or right to the possession of, any property owned by the bank.").

**[3]** Today, it almost goes without saying that a parent corporation does not own the assets of its wholly-owned subsidiary by virtue of that relationship alone. As the Supreme Court explained in more recent years:

> A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities. An individual shareholder, by virtue of his ownership of shares, does not own the corporation's assets . . . . A corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary.

*Dole Food Co. v. Patrickson*, 538 U.S. 468, 474-75 (2003) (citations omitted); *see also United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." (internal quotation marks omitted)); 1 William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 31 (2006) ("The property of the corporation is its property and not that of the shareholders as owners. . . . That is to say, the capital or assets of the corporation are its property, and the shares evidenced by the stock certificates are the property of the shareholders, which do not carry the capital property or any profits until they have been declared and vested as dividends. . . . A holding corporation does not own the subsidiary's property."); 18A Am. Jur. 2d Corporations § 632 ("Even complete ownership of all outstanding stock of a corporation is not the equivalent of ownership of a subsidiary's property or assets, because a parent and subsidiary comprise two wholly separate entities with individual property rights, no transfer of title to corporate property taking place."); 15 Cal. Jur. 3d Corporations § 335 ("The shareholders are not the owners of corporate property.").

We have applied this fundamental precept of corporate law in various contexts. For instance, in *Katzir's Floor & Home*

*Design, Inc. v. M-MLS.com*, 394 F.3d 1143 (9th Cir. 2004), we concluded that the district court abused its discretion when it amended a judgment entered against a defunct corporation to include the corporation's sole shareholder. *Katzir's Floor & Home Design*, 394 F.3d at 1149. We explained that the sole shareholder and the subsidiary corporation were distinct entities, so the liabilities of the former could not be imputed to the latter absent a showing that the corporate form had been abused. *See id.* ("The mere fact of sole ownership and control does not eviscerate the separate corporate identity that is the foundation of corporate law."). Similarly, in *Doe v. Unocal Corp.*, 248 F.3d 915 (9th Cir. 2001), we rejected an attempt to obtain jurisdiction over a parent corporation by virtue of its subsidiaries' activities, noting that "the fact that [the parent] indirectly owns or holds the stock of [the subsidiaries] does not, without more, convert these two corporations into general agents for [the parent] for jurisdictional purposes." *Unocal*, 248 F.3d at 930; *see also id.* at 925 ("The existence of a relationship between a parent company and its subsidiaries is not sufficient to establish personal jurisdiction over the parent on the basis of the subsidiaries' minimum contacts with the forum."); *Int'l Bhd. of Teamsters, Local 952 v. Am. Delivery Serv. Co.*, 50 F.3d 770, 775 (9th Cir. 1995) (noting, in the labor context, that "[a] subsidiary should be considered a separate entity so long as it is not under the 'actual or constructive control' of its parent").

**[4]** We see no reason to set aside fundamental principles of corporate law in the context of the federal bank fraud statute, particularly where Congress provided no indication that we should do so. *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) ("We assume that Congress is aware of existing law when it passes legislation."). In fact, rather than instructing us to ignore corporate law principles by considering FDIC-insured banks and their subsidiaries as one and the same, Congress has taken alternative measures to expand the reach of the bank fraud statute. In May 2009, Congress amended the definition of "financial institution" to include mortgage lend-

ing businesses. *See* Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 2(a)(3). Had this amendment been in effect at the time of Bennett's criminal activity, Bennett's bank fraud convictions involving Equicredit undoubtedly would stand.

**[5]** Here, the government presented evidence that Bennett fraudulently procured funds from Equicredit; that Equicredit was a wholly-owned subsidiary of BOA; and that BOA was a "financial institution" because it was FDIC-insured. We hold that, based on these facts and the governing law at the time of the offense, no rational trier of fact could have found that Bennett procured assets "owned by" a financial institution.

Urging us to conclude otherwise, the government asks us to reject a century's worth of corporate jurisprudence and instead follow a thirty-year-old opinion from the Fifth Circuit Court of Appeals. *See United States v. Cartwright*, 632 F.2d 1290 (5th Cir. 1980). In *Cartwright*, the Fifth Circuit concluded that a subsidiary's assets "belonged to" a parent corporation for purposes of 18 U.S.C. § 657, which made it a crime to misapply funds belonging to a financial institution. *Cartwright*, 632 F.2d at 1292. The *Cartwright* court acknowledged that it "is perhaps true that under principles of corporations law the assets of a wholly-owned subsidiary do not 'belong' to the sole shareholder in a legal sense." *Id.* It nonetheless concluded that the subsidiary's assets "belonged to" the parent for purposes of § 657 because "it is difficult to assail the argument that depleting the assets of a wholly-owned subsidiary reduces the value of the subsidiary's stock and thus directly diminishes the assets of the parent." *Id.*; *see also United States v. White*, 882 F.2d 250, 253 (7th Cir. 1989) (acknowledging that "[a] wholly owned subsidiary is, by definition, wholly owned by its parent, so it is natural to attribute its assets to the parent").

We find *Cartwright* unpersuasive. First, the *Cartwright* court did not explain why "principles of corporations law"

should be cast aside in the context of the statute it was apply-ing. Second, the *Cartwright* court failed to appreciate the dis-tinction between the act of misapplying funds belonging to a financial institution and the act of diminishing the value of a financial institution's assets. Though both actions might be objectionable, Congress only criminalized the former. We must be mindful of the precise language Congress used to describe the illegal conduct. Unlike other statutes, the bank fraud statute does not make it a crime "to devalue" a financial institution's assets or "to affect" a financial institution. *See, e.g.*, *United States v. Bouyea*, 152 F.3d 192, 195 (2d Cir. 1998) (finding that the jury could conclude that wire fraud against a wholly-owned subsidiary "affects" the parent corpo-ration); *United States v. Pelullo*, 964 F.2d 193, 215-16 (3d Cir. 1992) (same). Instead, the bank fraud statute makes it a crime fraudulently "to obtain" assets "owned by" a financial institution. Because no rational trier of fact could conclude that the assets Bennett fraudulently procured from Equicredit were "owned by" BOA, sufficient evidence does not support Bennett's conviction on that basis.

The government does not argue that BOA had "custody or control" of Equicredit's funds under § 1344(2) — indeed, at oral argument, the government stated that the record would not support such a finding. The dissent nevertheless maintains that a rational juror could find "custody or control" based on the undisputed fact that Equicredit was wholly owned by BOA. While the dissent properly asserts that, in the suffi-ciency analysis, all evidence in the record should be consid-ered in the light most favorable to the prosecution, *see Jackson*, 443 U.S. at 319, we agree with the government that no rational juror could conclude that BOA had custody or control of Equicredit from the evidence adduced at trial.[2]

---

[2]Because the terms "custody" and "control" are not defined in the bank fraud statute, we "construe [them] according to [their] ordinary, contem-porary, common meaning[s]." *See United States v. W.R. Grace*, 504 F.3d 745, 755 (9th Cir. 2007). In ordinary usage, to have "custody" over a thing

**[6]** Under the sufficiency of the evidence inquiry, "[c]ircumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction," but "mere suspicion or speculation cannot be the basis for creation of logical inferences." *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1994) (quoting *United States v. Lewis*, 787 F.2d 1318, 1323 (9th Cir.), *amended on denial of reh'g*, 798 F.2d 1250 (9th Cir. 1986), *cert. denied*, 489 U.S. 1032 (1989)). The government introduced no evidence regarding the relationship between BOA and Equicredit, and the record contains nothing from which the jury could discern the nature, amount, or even existence of any control exercised by BOA. Though we can speculate — as opposed to draw a reasonable inference — that BOA may have been involved in Equicredit's business or decisionmaking, *see, e.g.*, *United States v. Edelkind*, 467 F.3d 791 (1st Cir. 2006); *In re W. States Wholesale Natural Gas Litig.*, 605 F. Supp. 2d 1118 (D. Nev. 2009), or may have funded the loans Equicredit issued, *see, e.g.*, *United States v. Chandler*, 66 F.3d 1460 (8th Cir. 1995); *United States v. Brandon*, 17 F.3d 409 (1st Cir. 1994), BOA may just as plausibly have been an absent corporate parent, exercising no control over Equicredit at all, *see, e.g.*, *Jenkins v. Union Corp.*, 999 F. Supp. 1120 (N.D. Ill. 1998).

**[7]** Because the government relied solely on Equicredit's status as a wholly-owned subsidiary, and presented no evidence indicating what kind of parent-subsidiary relationship actually existed, any inference drawn from Equicredit's wholly-owned subsidiary status would be impermissible spec-

---

is to have it in one's "keeping; guardianship; [or] care." Webster's College Dictionary 335 (Random House 1991); *see also* Webster's New Collegiate Dictionary 318 (9th ed. 1983) (defining "custody" as the "immediate charge and control . . . exercised by a person or an authority"). To "control" a thing is "to exercise restraint or direction over; dominate, regulate, or command." Webster's College Dictionary 297 (Random House 1991); *see also* Webster's New Collegiate Dictionary 285 (9th ed. 1983) (defining "control" as the "power or authority to guide or manage").

ulation. That status, standing alone, provides no basis from which to infer control beyond a reasonable doubt given the endless variety of parent-subsidiary relationships that can accompany it. *See White*, 882 F.2d at 253 (refusing to draw inferences about a parent-subsidiary relationship based on wholly-owned subsidiary status alone). Thus, the fact that BOA owns all of Equicredit's shares does not indicate custody or control, and no rational juror could so find on that basis. Because the government presented no evidence showing that the assets Bennett obtained were under BOA's "custody or control," sufficient evidence does not support Bennett's conviction of the three counts at issue.

## CONCLUSION

**[8]** Given that the government does not argue that Bennett defrauded a financial institution, and that no rational juror could find beyond a reasonable doubt that the funds at issue were "owned by, or under the custody or control of" a financial institution in the circumstances presented here, Bennett's conviction and sentence for counts eight through ten must be vacated. We remand for proceedings consistent with this opinion.

**VACATED and REMANDED.**

---

CALLAHAN, Circuit Judge, dissenting:

I dissent from the majority's holding that James Davis Bennett's ("Bennett") conviction on counts eight through ten of his twelve-count indictment must be vacated because, viewed in the best light for the prosecution, there was insufficient evidence to support his conviction on those counts. I would affirm.

First, I agree with the majority that the applicable standard of review is the two-step standard articulated in *Jackson v.*

*Virginia*, 443 U.S. 307, 319 (1979), in which viewing the evidence in the light most favorable to the prosecution, we then consider whether any rational juror could conclude that the government met its burden of proof.

Here, there is no doubt that Bennett committed the mortgage fraud that he has been convicted of, the only question is whether, viewed in the best light for the prosecution, there was sufficient evidence for any rational juror to conclude that the mortgage fraud Bennett committed against Equicredit Corporation ("Equicredit"), which is a wholly-owned subsidiary of Bank of America ("BoA"), was against a "financial institution" within the meaning of 18 U.S.C. § 1344.[1] Under § 1344, it is a federal crime to knowingly execute, or attempt to execute, a scheme or artifice "(1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises."

I would find that there was sufficient evidence in the record for a rational juror to find that Bennett obtained property from Equicredit under the "custody or control" of BoA even if BoA did not actually exercise actual control over Equicredit. Specifically, at trial evidence was presented that the parent, BoA, owned 100 percent of the shares of its subsidiary, Equicredit. Viewed in the light most favorable for the prosecution, a rational juror could conclude that this evidence supported the conclusion that, as sole shareholder, BoA had the authority to exercise some level of control over Equicredit. Therefore, by defrauding Equicredit, Bennett was defrauding the financial institution BoA, which had the right to "custody or control" over its subsidiary within the meaning of § 1344. I would therefore affirm.

---

[1]A "financial institution" is defined as any bank or savings association the deposits of which are insured by the Federal Deposit Insurance Corporation. *See* 18 U.S.C. § 20(1); 12 U.S.C. § 1813(c)(2).