RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0179p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

AMIR BABAK BANYAN (17-6410); BRYAN PUCKETT (17-6493),

*Defendants-Appellants*.

> Nos. 17-6410/6493

———————————

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:14-cr-00101—Aleta Arthur Trauger, District Judge.

Argued: October 4, 2018

Decided and Filed: August 5, 2019

Before: SILER and KETHLEDGE, Circuit Judges; OLIVER, District Judge.[*]

———————————

## COUNSEL

**ARGUED:** J. Alex Little, BONE MCALLESTER NORTON PLLC, Nashville, Tennessee, for Appellant in 17-6410. Stuart A. Berman, LERCH, EARLY, & BREWER, CHTD., Bethesda, Maryland, for Appellant in 17-6493. Sangita K. Rao, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** J. Alex Little, BONE MCALLESTER NORTON PLLC, Nashville, Tennessee, for Appellant in 17-6410. Stuart A. Berman, LERCH, EARLY, & BREWER, CHTD., Bethesda, Maryland, for Appellant in 17-6493. Elizabeth H. Danello, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Byron M. Jones, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee.

———————————

[*]The Honorable Solomon Oliver, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

KETHLEDGE, J., delivered the opinion of the court in which OLIVER, D.J., joined. OLIVER, D.J. (pp. 9–11), delivered a separate concurring opinion. SILER, J. (pp. 12–13), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

KETHLEDGE, Circuit Judge. In this case the government charged the defendants with the wrong crimes. Amir Banyan and Bryan Puckett engaged in a scheme in which they eventually obtained more than $5 million from a pair of mortgage companies by means of fraudulent mortgage applications. The scheme was revealed about two years after it began. Had the government charged Banyan and Puckett with mail or wire fraud within the five-year limitations periods for those offenses, the two likely would have lacked any plausible defense. But for whatever reason the government blew that deadline and instead later charged Banyan and Puckett with bank fraud, of which they were both convicted. That offense has a longer limitations period, but brings the complication that the fraud must be perpetrated against a *bank*—which (as a matter of statutory definition) the mortgage companies obviously were not, because they were not federally insured. Nor did the government make any effort at trial to prove that the loans were funded by the mortgage companies' parent corporations, which were banks. The government now offers various theories to work around these deficiencies, but none has merit. We therefore reverse the defendants' convictions.

I.

In January 2006, Puckett was a homebuilder in Nashville; Banyan was a mortgage broker who had previously worked at SunTrust Mortgage Company. Puckett was overloaded with debt incurred while building some half-dozen luxury homes that he had not yet sold. With Banyan, Puckett recruited straw buyers to purchase his unsold homes with loans funded by SunTrust Mortgage Company and Fifth Third Mortgage Company. For a fee typically in the neighborhood of $10,000, each buyer submitted to the mortgage company a loan application—in most cases filled out by Banyan—that overstated the buyer's income and falsely stated that the buyer intended to live in the home, among other misrepresentations. None of those

misrepresentations, on the record here, reached the parent corporations of the mortgage companies, namely SunTrust Bank and Fifth Third Bank, both of which were federally insured. Nor, on the record here, did either of the parent banks fund any of the loans.

Puckett received the proceeds of the loans, which he told the buyers he would use to make their mortgage payments for them. Altogether, pursuant to the scheme, Puckett sold eight homes to straw buyers and received more than $5 million from the mortgage companies. (Presumably Banyan took a share as well.) By late 2007, however, Puckett could not keep up with all the payments for the fraudulent loans and his preexisting debt. By the end of 2008, the mortgage companies had foreclosed on most if not all the homes.

Although the FBI began investigating the scheme in 2009, the government did not indict Banyan or Puckett until 2014, on various counts of bank fraud in violation of 18 U.S.C. § 1344 and conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349. A jury convicted each defendant of two counts of bank fraud and one count of conspiracy. Although each defendant's Guidelines range exceeded five years' imprisonment, the district court sentenced each defendant to six months and ordered each released pending appeal. *See* 18 U.S.C. § 3143(b). This appeal followed.

II.

Banyan and Puckett challenge the sufficiency of the evidence for their convictions for bank fraud in violation of 18 U.S.C. § 1344. We must affirm their convictions if, based upon the evidence admitted at trial, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

The issue here is more legal than factual. Section 1344 provides:

Whoever knowingly executes, or attempts to execute, a scheme or artifice—

> (1) to defraud a financial institution; or

> (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises

[shall be guilty of a crime].

As used in these provisions, the term "financial institution" means, as relevant here, a federally "insured depository institution." 18 U.S.C. § 20(1). (We shall use the term "bank" as a synonym for "financial institution.")

Here, each defendant was convicted under § 1344(1) and § 1344(2). Most of the parties' arguments concern § 1344(2), so we begin our discussion there. That subsection "requires that a defendant 'knowingly execute, or attempt to execute, a scheme or artifice' with at least two elements." *Loughrin v. United States*, 573 U.S. 351, 355 (2014) (brackets omitted). The first is that the defendant must "inten[d] to obtain bank property." *Id.* (internal quotation marks omitted). The second is that "the envisioned result—*i.e.*, the obtaining of bank property—[must] occur 'by means of false or fraudulent pretenses, representations, or promises.'" *Id.* at 355-56. That second element is met when "the defendant's false statement is the mechanism naturally inducing a bank (or custodian of bank property) to part with money in its control." *Id.* at 363.

The government proved neither element here. The basic problem with the government's case is that neither of the mortgage companies from which the defendants obtained funds were "financial institutions" as defined by § 20, because neither of those companies had deposits that were federally insured. *See* 18 U.S.C. § 20(1). That statutory determination is as straightforward as they come. Yet the government argues that we should regard the mortgage companies as banks because each of them is a wholly owned subsidiary of a bank. That argument is nearly frivolous: as the Second Circuit observed in rejecting it, "a 'financial institution' [as the term is used in § 20] is not a loose or colloquial term, but a term of precise [legal] definition that can lead to grave criminal consequences." *United States v. Bouchard*, 828 F.3d 116, 126 (2d Cir. 2016). The Supreme Court has also instructed that "[a] basic tenet of American corporate law is that the corporation [here, the mortgage companies] and its shareholders [here, the banks] are distinct entities." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003). And Congress has precisely defined the term "financial institution," as relevant here, to apply to institutions that hold federally insured deposits—which the defrauded mortgage companies undisputedly did not.

Still the government persists, citing a potpourri of vague legislative history to the effect that, *e.g.*, "Congress wanted Section 1344 to have a broad scope." Gov't Br. at 18. But "we do not resort to legislative history to cloud a statutory text that is clear." *Ratzlaf v. United States*,

510 U.S. 135, 147-48 (1994).  Indeed all of the government's legislative history is irrelevant, because "[e]xtrinsic materials" like legislative history "have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of *otherwise ambiguous terms*." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005)  (emphasis added); *see also, e.g.*, *Dep't of Housing & Urban Dev. v. Rucker*, 535 U.S. 125, 132 (2002) ("reference to legislative history is inappropriate when the text of the statute is unambiguous"); *United States v. Gonzales*, 520 U.S. 1, 6 (1997) ("Given the straightforward statutory command, there is no reason to resort to legislative history").  And the government nowhere identifies the purportedly ambiguous terms—by which, of course, the Supreme Court means the ambiguous *words*—that its legislative history purports to clarify.  Meanwhile, a year after the events at issue here, Congress took the trouble to amend § 20 to add "mortgage lending businesses" (*i.e.*, mortgage companies) to its enumeration of "financial institutions" under that section.  *See* Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 2(a)(3).  And the Supreme Court has repeatedly said that, "'[w]hen Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect.'"  *Pierce Cty., Wash. v. Guillen*, 537 U.S. 129, 145 (2003) (quoting *Stone v. INS*, 514 U.S. 386, 397 (1995)).  The government's argument that the mortgage companies themselves were "financial institutions" as defined by § 20 at the time of the defendants' conduct, therefore, is meritless.

That means the government needed to prove, as the first element of § 1344(2), that these defendants intended to obtain bank property, rather than the property of the mortgage companies (whose property they actually did obtain).  But the government did not prove that.  The government offered no evidence, for example, that either of the parent banks funded the loans at issue and that the defendants were aware of such funding.  That omission distinguishes this case from *United States v. Rabuffo*, 716 Fed. App'x 888, 898 (11th Cir. 2017) (unpublished, per curiam), where the government presented evidence that the defendant was well aware that a bank "would be handling any draw requests on the loans."  (The *Rabuffo* opinion asserted—based upon its reading of the district court's opinion in this case—that Banyan thought that SunTrust Bank had funded some of the transactions at issue here, *id*. at 899; but suffice it to say that the Eleventh Circuit seriously misconstrued the record in this case—which of course the court did not have.)  *See also United States v. Chittenden*, 848 F.3d 188, 201 (4th Cir.), *vacated on other*

*grounds*, 138 S. Ct. 447 (2017) (bank funded the loans through a line of credit to mortgage company); *United States v. Edelkind*, 467 F.3d 791, 797-98 (1st Cir. 2006) (bank approved the mortgage company's loans). True, the government did show that Puckett made mortgage payments with checks made out to "SunTrust Bank" rather than to "SunTrust Mortgage Company." But those checks standing alone are not enough for a jury to find beyond a reasonable doubt that, when the defendants submitted fraudulent loan applications to the mortgage companies, they actually intended to obtain funding from the banks. On this record, rather, the checks are a data point connected to nothing. Nor did the government develop any such argument in its brief on appeal. And otherwise the government did not even try to prove that the defendants schemed to obtain bank property.

Instead the government argues that, in its view, the parent banks "owned" the funds that the mortgage companies provided to the defendants, because the banks owned those companies. But as the Ninth Circuit observed in rejecting the same argument, "[m]ore than a century of corporate law says otherwise." *United States v. Bennett*, 621 F.3d 1131, 1136 (9th Cir. 2010). *Dole Food* specifically instructs—again as an elementary principle of corporate law—that "[a]n individual shareholder, by virtue of his ownership of shares, does not own the corporation's assets[.]" 538 U.S. at 475; *see also Soc'y for Sav. in City of Cleveland v. Bowers*, 349 U.S. 143, 147 (1955) ("stockholders' interests in a corporation represent a separate property interest from the corporation's ownership of its assets"); *Rhode Island Hosp. Tr. Co. v. Doughton*, 270 U.S. 69, 81 (1926) ("owner of the shares of stock in a company is not the owner of the corporation's property"). Thus, "it almost goes without saying that a parent corporation does not own the assets of its wholly owned subsidiary by virtue of that relationship alone." *Bennett*, 621 F.3d at 1136. Hence we too "see no reason to set aside fundamental principles of corporate law in the context of the federal bank fraud statute, particularly where Congress has provided no indication that we should do so." *Id*. at 1137.

The government similarly argues that the banks had "custody or control of" the mortgage companies' funds, 18 U.S.C. § 1344(2), because "the jury could reasonably assume that a parent company has some 'duty' to protect the funds of its wholly owned subsidiary and, moreover, has the 'power or authority to guide or manage' those funds." Gov't Br. 28. But the government

offers no authority for the proposition that—as a matter of law—the jury may make those assumptions, beyond a reasonable doubt no less, in a bank-fraud or any other kind of case. And at trial the government offered no evidence that the banks here in fact had "some duty" or power or authority to "guide or manage" the mortgage companies' funds. Hence this argument too is meritless.

Finally, as to the first element of § 1344(2), the government likewise argues that "the jury could reasonably infer . . . that the funds obtained from the mortgage companies belonged to the parent banks[,]" because any losses incurred by the mortgage companies would "flow directly up" to the banks. Gov't Br. at 24. But this argument is merely a rehash of the government's argument that we should disregard the separate corporate forms of the mortgage companies and the parent banks. And the argument otherwise disregards the statutory text that the Supreme Court so carefully interpreted in *Loughrin*. That text requires the government to prove the defendant's "intent to *obtain* bank property," 573 U.S. at 355 (emphasis added), not merely to diminish its value. *Accord Bennett*, 621 F.3d at 1138 (holding that the same argument "fail[s] to appreciate the distinction between the act of misapplying funds belonging to a financial institution and the act of diminishing the value of a financial institution's assets"). True, in a pre-*Loughrin* case, the D.C. Circuit affirmed a defendant's bank-fraud conviction on the ground that "a loss to [the mortgage company] would constitute a loss to [the parent bank]." *United States v. Hall*, 613 F.3d 249, 252 (D.C. Cir. 2010). But the court's brief analysis did not mention the statutory text—indeed the court did not specify whether it was applying § 1344(1) or, alternatively, § 1344(2). And in any event *Hall*'s purely economic reasoning is inconsistent with the Court's textual reasoning in *Loughrin*. In summary, therefore, the government did not prove that Banyan or Puckett "intend[ed] to obtain bank property" as required by § 1344(2). *Loughrin*, 573 U.S. at 355.

Nor, more briefly, did the government prove that the defendants sought to obtain bank property "by means of" a misrepresentation. 18 U.S.C. § 1344(2). That element of § 1344(2) limits the provision's scope to "frauds in which a false statement will naturally reach [a federally insured] bank (or a custodian of the bank's property)." *Loughrin*, 573 U.S. at 365 n.8. As shown above, the mortgage companies were not custodians of the bank's property, on this record,

because the banks did not fund the subject loans. And the government again presented no evidence that any of the misrepresentations on the subject loan applications ever reached the ears of anyone at the parent banks. As to both defendants, therefore, the government failed to prove a violation of § 1344(2).

The same is true of § 1344(1). That subsection requires the government to prove that a defendant specifically "intend[ed] to 'defraud a financial institution[,]'" *Loughrin*, 573 U.S. at 357 (quoting § 1344(1)), as opposed to a mortgage company. Here, as shown above, the government did not present proof of any such specific intent, or even try. Instead, on this record, the scheme's effect on the value of the banks' ownership interests in the mortgage companies was merely "incidental" to the scheme's goal of defrauding the mortgage companies. *Cf. Loughrin*, 563 U.S. at 363. To prove fraud under § 1344(1), in contrast, the government at a minimum needed to prove that the defendants intended to "cause[] a federally insured bank to transfer funds under its possession and control." *United States v. Everett*, 270 F.3d 986, 991 (6th Cir. 2001). And again the government provided no proof that the defendants had any intent to cause a transfer by a bank. Thus, in summary, the government did not prove that either defendant committed bank fraud in violation of § 1344(1) or (2). Their convictions for bank fraud therefore cannot stand.

Nor did the government prove that the defendants conspired to defraud a bank in violation of 18 U.S.C. § 1349. The government's argument on this charge is derivative of its arguments as to the sufficiency of the evidence under § 1344, *see* Gov't Br. at 36-37, and fails for the same reasons.

\*     \*     \*

The district court's judgments are reversed, and each defendant's case is remanded with instructions to enter a judgment of acquittal.

———————————

**CONCURRENCE**

———————————

OLIVER, District Judge, Concurring. I agree with the majority that the following arguments made by the Government are clearly not well taken: (1) that the jury could infer that the banks were defrauded on evidence that the mortgage companies were wholly-owned subsidiaries of FDIC-insured banks; (2) that the jury could infer that the mortgage companies' funds were under the custody or control of the parent banks, because the mortgage companies are wholly-owned subsidiaries; and (3) that the jury could infer that "the funds obtained from the mortgage companies belonged to the parent banks," because the subsidiaries' year-end profits and losses flowed up to the parent banks. Gov't Br. at 23-29. The Government's arguments are all based, in some sense, on the notion that, because the mortgage companies here were wholly-owned subsidiaries of FDIC-insured banks, that fact alone is sufficient to support a jury finding beyond a reasonable doubt that the FDIC-insured banks were defrauded. However, courts have rejected this notion, concluding that, because banks are distinct corporate entities from their subsidiaries, and the statute defines "financial institutions" as FDIC-insured banks, the entities are different for purposes of Section 1344(2). Thus, the mere fact that a mortgage company is wholly owned by a FDIC-insured parent bank is insufficient to show that the parent owned or controlled the funds, or any other assets, of its subsidiary. *See, e.g.*, *United States v. Bouchard*, 828 F.3d 116, 126 (2d Cir. 2016); *United States v. Alexander*, 679 F.3d 721, 728 (8th Cir. 2012); *United States v. Bennett*, 621 F.3d 1131, 1136 (9th Cir. 2010).

Courts have, however, upheld convictions under Section 1344(2) for bank fraud where the loans originating with a subsidiary mortgage company were shown to have a direct connection to the assets of the bank itself. *United States v. Chittenden*, 848 F.3d 188, 201 (4th Cir.), *vacated on other grounds*, 138 S. Ct. 447 (2017) (evidence that subsidiary's "loans were funded from an existing line of credit with [parent corporation]"); *United States v. Irvin*, 682 F.3d 1254, 1272–73 (10th Cir. 2012) (sustaining § 1344(2) conviction on evidence that the "loan proceeds disbursed from [the subsidiary] . . . indisputably came from the credit line extended to it by [the parent bank]"); *United States v. Edelkind*, 467 F.3d 791, 798 (1st Cir.

2006) (evidence "that a [bank] (not just its subsidiary) signed off on the loan" before mortgage company made it); *United States v. Walsh*, 75 F.3d 1, 9 (1st Cir. 1996) (evidence that subsidiary was "practically an alter ego" of the financial institution). But I again agree with the majority that the Government has not shown a connection of the type that courts generally have required to show bank fraud. The evidence adduced is insufficient to show that Defendants intended to obtain bank property under § 1344(2). Similarly, the evidence is insufficient to show that they intended to defraud the banks under § 1344(1). *Cf. United States v. Rabuffo*, 716 Fed. App'x 888, 895-99 (11th Cir. 2017) (convictions sustained under § 1344(1)).

The Government admits that there was "no explicit testimony that the banks were funding the loans and that the loans were federally insured[.]" Gov't Br. at 30. Rather, it points to Puckett's ex-wife's affirmative response to the prosecutor's leading question ("[a]nd the money came from the bank[]") as evidence that the parent bank funded the loans. However, her single-word answer, "correct," was given in the context of questioning that made no clear distinction between the bank and the mortgage company subsidiary, the very matter that needed to be clarified. The Government also contends that the jury could infer that Defendants knew the loans came from the parent banks because Defendants had "considerable experience with mortgage lending" companies. However, there is no evidence in the record to support a finding that such knowledge would have led them to the conclusion that the lines of credit issued in this particular case were FDIC insured. Finally, the Government argues that, because Defendant Puckett made a few checks out to SunTrust Bank, a number of months after commencement of the loans, the jury could conclude that the loans were financed by a line of credit from the bank and that Defendants knew this at the inception of the loan.

While it may well be that the banks were defrauded, the Government has not presented evidence sufficient to prove it. The evidence here falls far short of that which most courts have found sufficient to constitute fraud on the bank itself, such as evidence that the parent bank itself was handling draw requests on the loan, that the bank itself signed off on the loan, or that the loans were funded from an existing line of credit with the bank. I agree with the majority that, on this record, a reasonable jury could not find beyond a reasonable doubt that the evidence was

sufficient to sustain the convictions of either Defendant for bank fraud or conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349.

———————————

**DISSENT**

———————————

SILER, Circuit Judge, dissenting.  As seen from the majority opinion, very few cases have discussed this dilemma.  It would have been easy for the prosecution to have charged the defendant with mail or wire fraud before the statute of limitations expired, but it was not effected for some reason.  Now, we must decide whether the conduct by defendants amounted to a violation of the bank fraud statute.  I think it did and I would affirm the convictions for the reasons stated herein.

There is little dispute that the defendants perpetrated a fraud on the mortgage companies involved.  The basic question is whether the wholly-owned subsidiaries (mortgage companies) are part of the parent banks.  The fraud on the mortgage companies is fraud on the banks. Defendants knew this and conducted their business with the banks directly.  For instance, checks from Puckett to repay some of the debt to SunTrust Mortgage were paid directly to SunTrust Bank and Puckett's ex-wife admitted the fraudulently obtained mortgage funds came from the bank.

When 18 U.S.C. § 1344 was considered for amendment in 2009, to include mortgage lending businesses under the definition of "financial institutions," Congress wanted to be certain that there would be no problems like the ones in this particular case.  The majority correctly indicates that the language was not included without purpose, but I think Congress wanted to close any potential loophole that might arise.  In particular, Congress was concerned with amending the statute to include the transactions where most of the fraud was occurring, that is, with independent mortgage companies which were not a subsidiary of a bank already covered under the Federal Deposit Insurance Corporation.

The majority dismisses the decision in *United States v. Hall*, 613 F.3d 249, 252 (D.C. Cir. 2010), because it was decided before *Loughrin v. United States*, 573 U.S. 351, 355 (2014), but I find no inconsistencies between the two decisions.  The language from *Hall* in particular would allow this court to uphold the convictions under both subsections of the statute where it states

"being wholly owned by federally insured Guaranty Bank, a loss to GRL would constitute a loss to Guaranty Bank." *Hall*, 613 F.3d at 252. Similarly, in this case, a loss to one of these wholly owned subsidiaries constitutes a loss to the parent bank corporation. *See also United States v. Chittenden*, 848 F.3d 188, 200-01 (4th Cir. 2017) (upholding conviction where subsidiary's "loans were funded from an existing line of credit with [parent corporation]"), *abrogated on other grounds and vacated*, 138 S. Ct 447 (2017); *United States v. Irvin*, 682 F.3d 1254, 1272-73 (10th Cir. 2012) (funds were owned by, and in the custody and control of the financial institution until dispersed via line of credit to the subsidiary mortgage company); *United States v. Walsh*, 75 F.3d 1, 9 (1st Cir. 1996) (subsidiary was practically an alter ego of the financial institution).

Therefore, I would affirm the convictions of both defendants under the statute involved.