In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 19-1004

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JESSICA ARONG O'BRIEN,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 17-cr-00239-1 — **Thomas M. Durkin**, *Judge.*

_____

ARGUED FEBRUARY 19, 2020 — DECIDED MARCH 13, 2020

_____

Before WOOD, *Chief Judge*, and FLAUM and RIPPLE, *Circuit Judges*.

FLAUM, *Circuit Judge*. A jury found Jessica A. O'Brien guilty of both bank fraud and mail fraud affecting a financial institution based on her participation in a 2004-to-2007 mortgage fraud scheme. She appeals her convictions, arguing that the charges against her were duplicitous and that under a properly pled indictment the statute of limitations would have barred three of the four alleged offenses. She also argues

that the district court should not have admitted evidence offered to prove those time-barred offenses and that there was insufficient evidence to support the jury's guilty verdict.

We affirm. The government appropriately acted within its discretion to allege an overarching scheme to commit both bank fraud and mail fraud affecting a financial institution. Each count included an execution of the fraudulent scheme within the applicable ten-year statute of limitations, and the jury's guilty verdict rested upon properly admitted and sufficient evidence of the charged offenses.

## I. Background

On April 11, 2017, a grand jury returned a two-count indictment charging O'Brien with mail fraud in violation of 18 U.S.C. § 1341 (Count I) and bank fraud in violation of 18 U.S.C. § 1344 (Count II). Both counts alleged a 2004-to-2007 scheme in which O'Brien misrepresented her income and liabilities to cause lenders to issue and refinance loans related to two investment properties O'Brien owned on the south side of Chicago: one at 625 West 46th Street (the "46th Street property"), and another at 823 West 54th Street (the "54th Street property"). During the alleged scheme, O'Brien was a licensed attorney with a background and experience in the real estate industry, including as a registered loan originator, mortgage consultant, licensed real estate broker, and owner of O'Brien Realty LLC, a licensed Illinois real estate company.

The indictment alleged that the scheme was comprised of four transactions: (1) in 2004, O'Brien "fraudulently obtained mortgage loan proceeds to purchase" the 46th Street property by submitting mortgage documents with false statements regarding her income and liabilities; (2) in 2005, O'Brien, with

co-defendant Maria Bartko as the loan originator, "fraudulently refinanced [O'Brien's] mortgage loans" on the 46th Street and 54th Street properties by submitting applications with false statements regarding O'Brien's income and employment; (3) in 2006, O'Brien "fraudulently obtained a commercial line of credit" by submitting an application with false statements about her realty company's revenue and profit "and used those loan proceeds to maintain the 46th Street and 54th Street properties"; and (4) in 2007, O'Brien and Bartko "agreed that O'Brien would sell the 46th Street and 54th Street properties to Bartko" using "Buyer A," Christopher Kwan, as "a straw buyer whom O'Brien and Bartko knew would be fraudulently qualified for mortgage loans." The indictment also alleged that O'Brien and Bartko knew "that false information would be submitted to lenders, including Citibank, N.A., to qualify [Kwan] for the mortgage loans." Some of her misrepresentations were made on HUD-1 forms (as the name suggests, furnished by the U.S. Department of Housing and Urban Development), which detail the costs and fees associated with a mortgage loan and are used in closing a property sale. *See United States v. Bouchard*, 828 F.3d 116, 121 n.2 (2d Cir. 2016).

Within each count, the indictment charged only one execution of the scheme: In Count I, the indictment alleged that on April 16, 2007, O'Brien and Bartko mailed a payoff check relating to the purchase of the 46th Street property; and in Count II, the indictment alleged that also on April 16, 2007, O'Brien caused Citibank, N.A. ("Citibank"), a financial institution, to provide $73,000 to fund a mortgage for Kwan's purchase of the 46th Street property. The indictment described the 2004, 2005, and 2006 transactions as part of an overarching

scheme rather than as separate executions of mail or bank fraud.

At trial, the government presented evidence that O'Brien had falsely represented her income and liabilities and made other misrepresentations and omissions when buying, refinancing, and maintaining the 46th Street and 54th Street properties. After the jury found O'Brien guilty on both counts and the district court denied O'Brien's post-trial motions, O'Brien appealed.

## II. Discussion

O'Brien argues that the district court erred by denying (1) her motions to dismiss the indictment based on duplicity and the statute of limitations, and (2) her motions for judgment of acquittal and a new trial based on the insufficiency of the evidence.

### A. Duplicity and Statute of Limitations

We review de novo the district court's denial of O'Brien's motions to dismiss the indictment on grounds of duplicity and the statute of limitations. *See United States v. McGowan*, 590 F.3d 446, 456 (7th Cir. 2009) (statute of limitations); *see also United States v. Pansier*, 576 F.3d 726, 734 (7th Cir. 2009) (duplicity).

#### 1. Duplicity

The district court did not err in denying O'Brien's motion to dismiss based on duplicity because each count of the indictment, "'fairly interpreted[,]' alleges a 'continuing course of conduct, during a discrete period of time.'" *United States v. Davis*, 471 F.3d 783, 790–91 (7th Cir. 2006) (quoting *United States v. Berardi*, 675 F.2d 894, 898 (7th Cir. 1982)). A count is

duplicitous if it "charges two or more distinct offenses within" the count. *United States v. Miller*, 883 F.3d 998, 1003 (7th Cir. 2018) (citation omitted). A count is not duplicitous, however, if it charges the commission of a single offense through different means, Fed. R. Crim. P. 7(c)(1), or if it charges acts that "comprise a continuing course of conduct that constitutes a single offense," *Miller*, 883 F.3d at 1003 (citation omitted).

The mail and bank fraud statutes prohibit schemes to defraud, *see* 18 U.S.C. §§ 1341 & 1344, which can include a "broad range of conduct," *United States v. Doherty*, 969 F.2d 425, 429 (7th Cir. 1992). "Schemes to defraud … often are multi-faceted and therefore the various means used in committing the offense may be joined without duplicity." *United States v. Zeidman*, 540 F.2d 314, 318 (7th Cir. 1976). Under the mail and bank fraud statutes, "for each count of conviction, there must be an execution" of the scheme to defraud, but "the law does not require the converse: each execution need not give rise to a charge in the indictment." *United States v. Hammen*, 977 F.2d 379, 383 (7th Cir. 1992). The government has the discretion to "allege only one execution of an ongoing scheme that was executed numerous times." *Id.*

The indictment alleged a single scheme to defraud lenders that consisted of four related transactions in which O'Brien used lies and concealment to obtain money from lenders for the 46th Street and 54th Street properties and for her own personal gain. Specifically, the indictment alleged that O'Brien lied to lenders to: (1) buy the 46th Street property in 2004; (2) refinance loans on the 46th Street and 54th Street properties in 2005; (3) obtain a loan to maintain the 46th Street and 54th

Street properties in 2006; and (4) sell the 46th Street and 54th Street properties in 2007.

O'Brien insists that "the quartet of isolated and disconnected transactions involving different times, people, types of transactions, different lenders and different alleged false material statements gives rise to the clear conclusion that there was no single continuous scheme to defraud." For example, O'Brien asserts that the government contended that she falsely certified that the 46th Street property was her primary residence, but the indictment made no similar allegations regarding her 54th Street purchase. She also emphasizes that the four transactions involved different parties, and that neither Citibank nor its wholly-owned subsidiary and mortgage lending arm, CitiMortgage, was involved in three of the transactions. O'Brien therefore contends that "[t]he four alleged transactions are so different and distinct that the only commonality is 'financial gain' or something equally general."

The relevant transactions, however, all involved: (1) at least one of a pair of investment properties on Chicago's south side (the 46th Street and 54th Street properties); (2) O'Brien; (3) lies in loan documents; (4) the same class of victims (lenders); and (5) the same goal of obtaining financing related to the two properties for personal enrichment. The government acted appropriately within its discretion to charge the transactions as different means for carrying out an overarching scheme to defraud. *Cf. Davis*, 471 F.3d at 791 (holding there was no duplicity where indictment charged "ongoing and continuous course of conduct, accomplished through three different methods," repeated numerous times over the years, all involving the same defendant); *United States v. Prieto*, 812

F.3d 6, 10, 12 (1st Cir. 2016) (finding no duplicity where indictment alleged three-year mortgage rescue program scheme involving 86 transactions with 30 mortgage lenders, in which defendant engaged in sham transfers of properties to straw purchasers who quitclaimed properties to defendant's organization, and noting that schemes to defraud "may harm different groups of victims at different times" (citing *United States v. Buchmeier*, 255 F.3d 415, 421 (7th Cir. 2001))).

### 2. Statute of Limitations

The district court also did not err in denying O'Brien's motion to dismiss based on the statute of limitations because the indictment alleged that each count was executed on April 16, 2007, which fell within the applicable ten-year statute of limitations. We determine the applicable statute of limitations, and whether the charges were timely brought, based on the face of the indictment. *See United States v. White*, 610 F.3d 956, 958 (7th Cir. 2010) ("An indictment is reviewed on its face, regardless of the strength or weakness of the government's case."). The statute of limitations for bank fraud is ten years. 18 U.S.C. § 3293(1). The statute of limitations for mail fraud is generally five years, *id.* § 3282(a), but a ten-year statute of limitations applies for fraud that "affects a financial institution," *id.* § 3293(2).

The indictment plainly alleged that the scheme to defraud affected Citibank, which O'Brien does not dispute qualified as a financial institution. The mail fraud count (Count I) alleged that Citibank required mortgage loan applicants to provide truthful information, which was material to its approval and funding of loans, and that O'Brien knew "that false information would be submitted to lenders, including Citibank, N.A., to qualify [Kwan] for the [2007] loans." The bank fraud

count (Count II) similarly charged an offense that affected a financial institution, as we explain below. A ten-year statute of limitations therefore applied to both counts. The ten-year period started to run from the date of the alleged executions, April 16, 2007. The grand jury returned the indictment on April 11, 2017, before the ten-year period expired.

### B. Sufficiency of the Evidence

The district court did not err in denying O'Brien's motions for a judgment of acquittal or a new trial because there was sufficient evidence to support O'Brien's convictions for mail fraud affecting a financial institution under 18 U.S.C. §§ 1341 & 3293(2) (Count I) and for bank fraud under 18 U.S.C. § 1344(2) (Count II). We review de novo the denial of a motion for a judgment of acquittal, which "should be granted only when the evidence is insufficient to sustain the conviction." *United States v. James*, 464 F.3d 699, 705 (7th Cir. 2006). The evidence is sufficient if "any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt." *United States v. Kelerchian*, 937 F.3d 895, 907 (7th Cir. 2019) (citation omitted). We "overturn a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *Id.* (citation omitted). We review for an abuse of discretion the denial of a motion for a new trial, which should be granted "only if the evidence preponderates heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *United States v. Swan*, 486 F.3d 260, 266 (7th Cir. 2007) (internal quotations marks, brackets, and citation omitted).

*1. Mail Fraud Affecting a Financial Institution (Count I)*

To convict O'Brien of mail fraud under 18 U.S.C. § 1341, the government had to prove beyond a reasonable doubt that O'Brien: (1) participated in a scheme to defraud; (2) intended to defraud; and (3) used the mails in furtherance of the scheme. *United States v. Seward*, 272 F.3d 831, 835 (7th Cir. 2001). Because the government relied on the ten-year statute of limitations applicable to mail fraud that "affects a financial institution," *see* 18 U.S.C. § 3293(2), it was also required to establish that the fraud affected a financial institution, which can be established by a showing that the fraud exposed the financial institution to "a new or increased risk of loss," *United States v. Serpico*, 320 F.3d 691, 694–95 (7th Cir. 2003). The government needed to show that O'Brien intended for her scheme to defraud "*someone*," but "a financial institution [did] not need to be the intended victim." *United States v. Marr*, 760 F.3d 733, 744 (7th Cir. 2014); *see also United States v. Pelullo*, 964 F.2d 193, 216 (3d Cir. 1992) (noting that 18 U.S.C. § 3293(2) applies to a "broader class of crimes" than those "where the financial institution is the *object* of the fraud").

Viewing the evidence in a light most favorable to the prosecution, O'Brien devised a scheme to defraud and made numerous false statements in furtherance of the scheme, including by inflating her income and concealing her biggest liability to obtain a loan to buy the 46th Street property in 2004; inflating the income from her realty company to refinance the loans on the 46th Street and 54th Street properties in 2005; inflating revenue and profits for her realty company to obtain a loan to maintain the 46th Street and 54th Street properties in 2006; and selling the 46th Street and 54th Street properties in 2007 to a straw buyer, while making kickback payments to the

true buyer without disclosing the identity of the buyer or the kickback payments to the lender.

The evidence further demonstrated that O'Brien fraudulently caused Citibank to provide Kwan the funding for two loans in connection with the 2007 purchase of the 46th Street property: one loan in the amount of $73,000 and another in the amount of $292,000. O'Brien's misrepresentations in connection with these transactions were established by, among other things, the false and fraudulent loan applications O'Brien submitted; documents related to the purchase and sale of the properties; the false HUD-1 forms; evidence of O'Brien's and her realty company's actual income; and testimony of Citibank vice president Judy Taylor. Citibank was not only exposed to an increased risk of loss; it suffered an actual loss as a result of the 2007 loans because it had to foreclose on the 46th Street property and ultimately sold the property at a "significant loss."[1]

The parties agree that—during the time relevant to this case—Citibank qualified as a financial institution, but its

---

[1] O'Brien appears to suggest that, even though her husband was not a co-borrower on one of the loans, her husband's income should have been counted when calculating her income to qualify for the loan. O'Brien has pointed to no authority explaining why the law compels such a result or otherwise explained how this circumstance undermines confidence in the jury's conclusion that she harbored the requisite fraudulent intent. O'Brien also contends that a witness from Chase testified that "it was possible that the Chase branch loan officer may have made mistakes when she entered O'Brien's LLC loan information" in connection with one of the loans. Such a speculative possibility, however, does not provide grounds for overturning the jury's verdict.

wholly-owned subsidiary, CitiMortgage, did not.[2] O'Brien maintains that CitiMortgage, not Citibank, was the lender for the $73,000 loan in April 2007.[3] She also concedes, however, that "countless exhibits presented by the government and defense offered conflicting testimony/exhibits regarding whether [CitiMortgage] or Citi[bank] funded" the $73,000 loan, and that related exhibits "cut both ways." This is precisely the kind of conflicting evidence that is within the jury's province to resolve.

This is not a case like *United States v. Bennett*, where "the government relied solely on [the mortgage lender]'s status as a wholly-owned subsidiary [of a financial institution], and presented no evidence indicating what kind of parent-subsidiary relationship actually existed." 621 F.3d 1131, 1139 (9th Cir. 2010). Nor is this a case like *United States v. Banyan*, where the government did not "make any effort at trial to prove that the loans were funded by the mortgage companies' parent corporations, which were banks." 933 F.3d 548, 551 (6th Cir. 2019).

Here, the government presented substantial evidence beyond Citibank's parent-subsidiary relationship with CitiMortgage to support the conclusion that Citibank funded the $73,000 and $292,000 loans. Citibank vice president Taylor, for example, testified that the $73,000 loan was a Citibank

---

[2] *See Bouchard*, 828 F.3d at 124 ("Prior to 2009, the term 'financial institution' was defined to include insured depository institutions of the FDIC, but not mortgage lenders."); *see also* 18 U.S.C. § 20(1) (amended in May 2009 to include non-FDIC mortgage lenders in definition of "financial institution").

[3] O'Brien does not appear to contest that the $292,000 for the other April 2007 loan came from Citibank.

product and that "all of the money used to fund both the $292,000 and the $73,000 loan came from a Citibank account." Several documents additionally identified Citibank as the lender on the $73,000 loan, such as the note, mortgage, HUD-1 settlement statement, truth-in-lending disclosure, affiliated business arrangement disclosure, and homeowner's insurance documents. O'Brien's signature on some of those documents is assurance enough that she saw them; the evidence of her link to other documents is not as direct.

The evidence on Count I was therefore sufficient to establish that O'Brien devised and participated in a fraudulent scheme, that she intended to defraud CitiMortgage, and that the fraud affected Citibank. *Cf. United States v. Mullins*, 613 F.3d 1273, 1278–79 (10th Cir. 2010) (affirming application of ten-year statute of limitations for fraud affecting a financial institution where jury heard evidence "explaining how fraudulent information on a loan application increases the risk of loss to the lender and its parent bank"); *United States v. Bouyea*, 152 F.3d 192, 195 (2d Cir. 1998) (per curiam) (holding there was sufficient evidence that financial institution was affected where employee of wholly-owned subsidiary testified that subsidiary borrowed money for transaction at issue from parent financial institution); *Pelullo*, 964 F.2d at 215–16 (disposing of defendant's assumption that "a fraud perpetrated against a financial institution's wholly owned subsidiary cannot affect the parent"). O'Brien does not contest the sufficiency of the evidence regarding the April 16, 2007 mailing in furtherance of the scheme. The mail fraud conviction is sound.

*2. Bank Fraud (Count II)*

The evidence was also sufficient to convict O'Brien of bank fraud under 18 U.S.C. § 1344(2). Section 1344 provides that a defendant may be found guilty of bank fraud if she:

> knowingly executes, or attempts to execute, a scheme or artifice—
>
> > (1) to defraud a financial institution; or
> >
> > (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises.

Count II of the indictment charged O'Brien with violating § 1344, which the government was permitted to prove under subsection (1) or (2). *See United States v. LeDonne*, 21 F.3d 1418, 1427 (7th Cir. 1994) (reasoning that the government may charge both sections of § 1344 in same count). While the government must prove that the defendant had the specific intent to defraud a financial institution under § 1344(1), proof of such intent is not required under § 1344(2). *Loughrin v. United States*, 573 U.S. 351, 356–57 (2014) ("[N]othing in [§ 1344(2)] additionally demands that a defendant have a specific intent to deceive a bank. And indeed, imposing that requirement would prevent § 1344(2) from applying to a host of cases falling within its clear terms.").

Rather, to obtain a conviction under § 1344(2), the government may demonstrate that the defendant knowingly "deceiv[ed] a non-bank custodian into giving up bank property

that it holds." *Id.* at 357. In *Loughrin*, the Supreme Court held that "the text of § 1344(2) preclude[d]" the defendant's argument that "his intent to deceive ran only to Target," a non-financial institution, "and not to any of the banks on which his altered checks were drawn." *Id.* at 356. The Court reasoned that applying § 1344(2) only "in the (presumably rare) circumstance in which the fraudster's intent to deceive extended beyond the custodian to the bank itself … would … function as an extra-textual limit on the clause's compass." *Id.* at 357. The defendant nevertheless "must at least know that the property belongs to or is under the custody or control of a bank." *Bouchard*, 828 F.3d at 126. Hence, to overturn the bank fraud conviction, O'Brien must convince us that no rational jury could infer that she knowingly deceived CitiMortgage into giving up Citibank funds.

We conclude that a rational jury could find—based on O'Brien's experience in the real estate industry and with Citibank in particular, as well as her intimate involvement in the fraudulent scheme and the 2007 transactions—that O'Brien knew that the funds for the April 2007 loans originated from Citibank. In *Bouchard*, the Second Circuit overturned a mortgage fraud conviction under § 1344(2) because the government had not established that the defendant knew that the funds fraudulently obtained from the mortgage lenders belonged to or were under the custody or control of a bank. 828 F.3d at 126–27. The Second Circuit noted that "the Government might have been able to prove that [the defendant] knew that money from mortgage lenders came from banks by virtue of his knowledge of the industry" but "failed to make this argument or proffer evidence of [the defendant]'s exten-

sive knowledge of the real estate and mortgage lending industry as a reason to convict him at trial." *Id.* at 127. The government provided precisely such evidence here.

O'Brien had an extensive background and experience in the real estate industry, including as a registered loan originator, mortgage consultant, licensed real estate broker, and owner of O'Brien Realty LLC, a licensed Illinois real estate company. She had prior experience working with Citibank in particular. Moreover, when Citibank vice president Taylor was asked about "a typical day at Citi back in 2007," she explained that "Citibank would provide funds to CitiMortgage" to fund loans in a similar way that it funded the April 2007 loans. Pairing O'Brien's extensive expertise in the real estate and mortgage lending industry with the fact that Citibank funded the April 2007 loans as it would in the ordinary course of its business supports the inference that O'Brien knew the funding would originate from Citibank.

Such an inference is buttressed by evidence of O'Brien's intimate involvement in the fraudulent scheme and especially her involvement in the April 2007 transactions. O'Brien acted as both the seller and seller's attorney, was present for the closings, was closely involved with the sale, and prepared the closing statements. The HUD-1 form O'Brien signed listed Kwan's $73,000 loan, and the HUD-1 form for that loan expressly identified Citibank as the lender. One might not normally expect a seller in an arms-length real estate transaction to have access to information to which the buyer has access, but this was no arms-length transaction. O'Brien and Kwan were co-participants in a scheme to defraud in which O'Brien and Bartko used Kwan as a straw purchaser. O'Brien, Kwan, and Bartko had signed notarized "Acknowledgement &

Agreements" forms (undisclosed in the HUD file and to the lender) that identified both Kwan and Bartko as buyers. O'Brien also made undisclosed payments to both Kwan and Bartko, including a $4,000 check to Kwan dated the day of the 46th Street closing, which Kwan endorsed over to Bartko.

Hence, the jury could reasonably have connected O'Brien's background and experience with the other evidence regarding the relationship between Citibank and CitiMortgage, as well as the identification of Citibank as the lender on loan documents and O'Brien's participation in the fraudulent scheme (and in the 2007 transactions in particular), to conclude that O'Brien knew the funds originated from Citibank. *Cf. United States v. Rabuffo*, 716 F. App'x 888, 898–99 (11th Cir. 2017) (affirming § 1344 conviction where it was reasonable to infer that defendant "knew the fraudulent loan applications would place SunTrust Bank at a risk of harm" based on defendant's background as "experienced real estate developer," defendant's involvement in scheme, similarity of names between SunTrust Bank and its wholly-owned subsidiary (SunTrust Mortgage), and defendant's previous interactions with SunTrust Bank).

The defendant in *Loughrin* violated § 1344(2) "because he made false statements, in the form of forged and altered checks, that a merchant would, in the ordinary course of business, forward to a bank for payment." 573 U.S. at 366. Similarly, O'Brien's fraudulent misrepresentations were "the

mechanism naturally inducing a … custodian of bank property … to part with money in its control." *Id.* at 363.[4] Her bank fraud conviction must stand.

### 3. *Materiality*

O'Brien raises a new argument on appeal that "there were no mail or bank fraud material misrepresentations because Citi[bank]'s loss risk was extraordinarily *de minimis*." According to O'Brien, Citibank's risk of loss due to this scheme represented only a small fraction of the $550 million "that [CitiMortgage] (and its subsidiaries) received … on a daily basis to fund its mortgage loan docket." O'Brien did not raise this argument in the district court and has therefore forfeited it, so our review is for plain error. *See United States v. Walsh*, 723 F.3d 802, 807 (7th Cir. 2013). In any event, there was no error, plain or otherwise.

Materiality requires only the tendency or capability of influencing the victim; there is no requirement that the misrepresentations must have actually influenced the decision-maker or that the decision-maker in fact relied on the misrepresentations. *See United States v. Roberts*, 534 F.3d 560, 571 (7th Cir. 2008). O'Brien has pointed to no authority supporting her novel argument that fraudulent misstatements are material only if they affect more than a de minimis proportion of a victim's funds.

Here, the jury heard evidence that if O'Brien had disclosed O'Brien Realty LLC's true financial status, her application for a commercial loan would have been denied. The jury also

---

[4] Because there was sufficient evidence to sustain the bank fraud conviction under § 1344(2), we need not reach the question of whether we could also sustain O'Brien's conviction under § 1344(1).

heard that, had O'Brien disclosed to Citibank that Kwan was a straw buyer and Bartko the true buyer, it would have raised a "red flag" and affected Citibank's risk analysis. The misstatements were therefore material. *Cf. United States v. Reynolds*, 189 F.3d 521, 525–26 (7th Cir. 1999) (affirming conviction and finding sufficient evidence of materiality "[b]ecause [defendant]'s false statements regarding his financial condition could clearly influence a bank deciding whether to approve a loan (even if they did not in fact influence the decision)").

**C. Admissibility of Evidence**

Finally, the district court did not abuse its discretion in admitting evidence relating to the 2004, 2005, and 2006 transactions as direct evidence of the fraudulent scheme alleged. *See United States v. Quiroz*, 874 F.3d 562, 569 (7th Cir. 2017) (reviewing evidentiary rulings for abuse of discretion). "[T]he fact that only one or two executions fell within the Statute of Limitations does not detract from the entire pattern of loans' being a scheme, and renders [the defendant] no less culpable for the entire scheme." *United States v. Longfellow*, 43 F.3d 318, 325 (7th Cir. 1994). We need not conduct a Federal Rule of Evidence 404(b) analysis because "if the evidence is admitted as direct evidence of the charged offense, Rule 404(b) is not applicable." *United States v. Adams*, 628 F.3d 407, 414 (7th Cir. 2010).

O'Brien tacks on that the district court should not have admitted the May 2007 quit claim deeds because those deeds are outside of the statute of limitations. Those deeds, however, are dated within the applicable ten-year statute of limitations, which began to run in April 2007. In any event, the district court appropriately admitted those deeds as direct evidence demonstrating that Kwan (the straw buyer) quit claimed the

properties to Bartko (the true buyer) shortly after the closings. They are admissible even though they are dated after the executions of the scheme to defraud. *See United States v. Ajayi*, 808 F.3d 1113, 1120 (7th Cir. 2015) (stating that the government may introduce uncharged acts of bank fraud after execution of scheme to support its case). The district court did not err in admitting the contested evidence.

## III. Conclusion

For the foregoing reasons, we AFFIRM O'Brien's convictions.