In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-2004

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ARTHUR FRIEDMAN,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:15-cr-00675-2 — **Amy J. St. Eve** and **Virginia M. Kendall**, *Judges.*

ARGUED JUNE 2, 2020 — DECIDED AUGUST 21, 2020

Before FLAUM, KANNE, and BRENNAN, *Circuit Judges.*

BRENNAN, *Circuit Judge.* To keep his car dealership afloat, Arthur Friedman secured loans for fake buyers of a phony inventory of cars. The scheme resulted in a bank fraud conviction, a 108-month prison sentence, and an order to pay roughly $5 million in restitution. We have cautioned against raising too many issues on appeal; Friedman raises nine to his conviction and his sentence. The district court ruled correctly in all respects, so we affirm.

## I. Background

Arthur Friedman and Leon Bilis co-owned Prestige Leasing, a luxury used car dealership. The dealership purchased, leased, sold, and exported luxury vehicles. When their dealership began to suffer financially in 2008, Friedman devised a plan and schemed with Bilis to get cash for their business. The dealership exported cars overseas yet kept the title certificates for many of them as "a lot of countries did not require original titles, just the copies." Friedman and Bilis secured loans against the exported cars, using the title certificates as proof of collateral. So Friedman and Bilis obtained loans backed by assets they no longer possessed.

At first the two used their own names on loan applications. Later they used the names of family, friends, former employees, and customers, most often without that person's knowledge. For each loan, Friedman and Bilis falsely said that the car was present in the United States and being sold to the listed borrower. The loan applications also included false employment or income information, falsified corporate documents and title information, and forged signatures, on which the banks relied.

To conceal the fraud, Friedman and Bilis took cash from customers for cars that the dealership never had or delivered. In particular, customers gave down payments or full deposits under the ruse that advance payments were needed to lock up cars with a limited inventory. Rather than use the customer funds as promised, Friedman and Bilis used the money to pay down the bogus car loans. They similarly bilked floorplan investors. Those investors financed cars to be marketed and sold on the Prestige dealership lot in exchange for a cut of the mark-up price; instead, their funding was tied to cars

that the dealership neither stocked nor intended to sell. The investors' funds, too, were used to pay down fraudulent loans.

Unsurprisingly, this scheme was unsustainable and in late 2011 banks came calling for unpaid loans. Local police, too, began investigating suspicious loan activity. Given the police investigation, Friedman and Bilis retained attorney Jeffrey Steinback to jointly represent them. This joint counsel arrangement was short-lived; around January 2012, Friedman ended his relationship with Steinback and retained separate counsel. Almost four years later the federal government got involved, and Friedman and Bilis were indicted.

The indictment charged seven counts of bank fraud—each count pointing to a specific loan—in violation of 18 U.S.C. § 1344. It alleged that from November 2008 until November 2011, Friedman and Bilis schemed to defraud banks by submitting loan applications for fake car purchases. It also alleged that Friedman and Bilis concealed the bank fraud by deceiving customers and floor-plan investors into fronting money for other fake car purchases, then used that money to make loan payments. Bilis—still represented by Steinback— pleaded guilty and entered a cooperation agreement with the government. Due to Bilis's plea, the government filed a redacted indictment, removing two counts charging Bilis alone and renumbering the rest. Friedman proceeded to trial on the remaining five counts. In relevant part, count five of the redacted indictment charged that Friedman and Bilis executed the fraud scheme by "knowingly caus[ing] American Eagle Bank to fund a vehicle loan for $62,589.57 in the name of Michael Blekhman for the purchase of a 2011 Porsche Panamera."

Less than a month before trial, Friedman moved to dismiss the indictment or, in the alternative, to exclude Bilis's testimony. Friedman claimed he shared "confidential information" with Steinback during the brief period of joint representation. And because Steinback represented Bilis through his eventual plea deal, "[i]t is impossible to discern … what confidential information Steinback provided to Bilis … that has now tainted Bilis as a witness."

The district court held an evidentiary hearing on Friedman's motion, at which Steinback and Friedman testified. Steinback testified he represented Prestige Leasing, Bilis, and Friedman "in connection with their business." Though no federal investigation loomed when hired, Steinback believed his representation "very well could be" for a criminal defense matter "but, at that juncture, it could also remain civil." In any event, Steinback advised Friedman and Bilis that they may later need independent counsel. Steinback testified Friedman never shared substantive information about the car loans or made any admission of wrongdoing during their discussions. For his part Steinback did not pass on information provided by Friedman to Bilis or the government. Steinback also produced his client file for the district court's ex parte review, and the court closed a portion of the hearing to allow Steinback to testify ex parte about potentially privileged matters.

Friedman gave a different account of the joint representation arrangement. He said he and Bilis met with Steinback at least three times. During those meetings, Friedman initially claimed that he kept discussing the joint matter with Steinback during Bilis's bathroom breaks because "[i]t's too expensive to talk about other stuff." That story evolved during the evidentiary hearing. Friedman later claimed he waited for

Bilis's bathroom breaks to tell Steinback "certain things" he did not want Bilis to hear, adding that Bilis took bathroom breaks lasting around ten to fifteen minutes. When asked whether those conversations had anything to do with the alleged fraud, Friedman responded, "in a way," and that "[m]ost of" those conversations involved "privileged communications" Still, Friedman never told Steinback to keep those communications from Bilis. Nor did Friedman ever attempt to privately relay these confidences to Steinback via telephone or a separate one-on-one meeting. Friedman testified he shared purportedly privileged information only when Bilis took bathroom breaks.

The district court denied Friedman's motion, explaining that it "carefully evaluated the demeanor and credibility of each witness, including his body language, tone of voice, facial expressions, mannerisms, and other indicative factors." Based on these factors, the court found that Friedman did not make any admissions of criminal wrongdoing to Steinback, crediting Steinback's "emphatic[]" testimony on this point and the lack of evidence in his client file suggesting that Friedman made such admissions. The court also found Friedman's testimony farfetched:

> [T]hat a criminal defendant—apparently concerned with his individual criminal exposure and desirous of keeping that concern from his business partner—would enter into joint representation with that business partner, and then await inherently unpredictable bathroom breaks to provide his lawyer with critical information (rather than calling him or meeting with him one-on-one) breaks the Court's credulity.

The district court continued: "Friedman testified that he read the government's reports on Bilis's proffers—yet in his briefs, on redirect, or *ex parte*, Friedman did not identify *any* similarities between what was contained in those reports and what he supposedly shared with Steinback in confidence." Because Friedman lacked evidence of prejudice from the use of privileged information, the district court ruled that a dismissal of charges or exclusion of Bilis's testimony was unwarranted. As a precaution, the district court provided a cautionary instruction that "Bilis was promised a benefit in return for his cooperation with the government" and to "consider [his] testimony with caution and great care."

When trial commenced, Bilis testified Friedman first proposed the scheme to secure loans on exported cars, and that the pair sought cash from other sources, including defrauding customers and floor-plan investors, to pay down those loans. According to Bilis, Friedman ramped up the fraud to build a house and to furnish it with imported décor. Friedman also prepared Prestige's financial documents, including outstanding loans and cash flow reports. Bilis identified Friedman's signature on loan documents, and he confirmed that no actual car transaction occurred on any loan, and that the cars involved were exported overseas before they submitted loan applications. Bilis further explained that Prestige made the car loan payments, not the named borrowers, and that dealerships do not pay down customer loans, especially when the car buyer is personally responsible for the debt.

Purported "borrowers" also testified, explaining they never purchased the cars in question, authorized the loan applications bearing their names, or received loan funds from the banks. Similarly, several Prestige customers and floor-

plan investors testified about giving large sums of cash for car purchases and investments, only to learn that their money was squandered. In particular, Prestige made a cash cow out of the Porsche Panamera vehicle noted in count five. Evidence showed that Prestige "sold" the same Porsche to multiple buyers, including Blekhman, but never delivered the car to any of them because it had already been exported overseas. Evidence also showed that Prestige took money from a floor-plan investor for the same Porsche. On top of that, Prestige forged a loan in Blekhman's name from American Eagle Bank for over $60,000. Altogether Prestige took in around $300,000 for the Porsche scam. When confronted with the scheme, several witnesses testified that Friedman confessed to the fraud.

Before the close of evidence, the district court noted that at the pretrial conference Friedman had not objected to the government's proposed jury instructions. Even so, the court asked the parties to reexamine the instructions for objections, giving them a three-day weekend for this review. Friedman requested changes to several instructions, but as relevant to this appeal, none involved Seventh Circuit Criminal pattern instruction 5.06(a)–(b) concerning aiding and abetting/acting through another. With jury instructions resolved, the parties proceeded to closing arguments.

Friedman's closing argument pinned the loan scheme entirely on Bilis, accusing him of fabricating Friedman's role to obtain a favorable government deal. In rebuttal, the government urged the jury to "use your common sense, check your gut," and rely on "your own life experience" to assess the case and the credibility of witnesses. As to the argument that Bilis operated as a lone actor and hid the fraud from Friedman, the government again asked the jury to "trust your gut" and use

"your own common sense … your own life experience" that Friedman, as president of Prestige, was not ignorant of the fraud, let alone Prestige's assumption of loan payment obligations for customers. Friedman objected to the government's "gut" references, arguing that "[t]heir gut is not what [the jury] is supposed to listen to." The government responded: "It's common sense … that the president of a two-man company knew exactly what was going on when a company's failing but he's still taking money out." The district court overruled Friedman's objection and instructed the jury "to use their common sense," explaining "that is what [the government] is arguing" and "[i]t is proper argument." The government then concluded: "If you do those two things, if you look at both the evidence … but also go with your gut, you are going to find [Friedman] guilty."

After deliberations the jury found Friedman guilty on three of the five counts. He moved for judgment of acquittal or a new trial under Federal Rules of Criminal Procedure 29 and 33, arguing, among other things, that: (1) the government presented insufficient evidence to convict on count five, the Blekhman loan charge; (2) Friedman's prosecution was "taint[ed]" by Steinback's continued representation of Bilis; and (3) the government's urging jurors to "go with [their] gut" minimized its burden of proof beyond a reasonable doubt. The district court denied those motions in a comprehensive written order.

Friedman then filed a second motion for a new trial, claiming to have "newly discovered" a 2015 forbearance agreement between Bilis and American Eagle Bank regarding Bilis's outstanding debt, and a 2016 loan from the bank to a business owned by Bilis's wife. The 2015 agreement and 2016 loan,

according to Friedman, "exposed a considerable bias and mo-tive to testify falsely against Friedman." The district court de-nied that motion, too.

With Friedman's post-verdict challenges exhausted, the district court calculated his adjusted offense level as 35, result-ing in an advisory Guidelines range of 168 to 210 months' im-prisonment. Even so, the court imposed a below-guidelines sentence of 108 months' imprisonment on each count, run-ning concurrently on each of the three counts, and ordered restitution of $4,722,347.

## II. Discussion

Friedman appeals a glut of pre-trial, trial, and post-verdict rulings. His arguments cover: (1) the alleged conflict of inter-est of Bilis's counsel; (2) jury instructions; (3) the jury's verdict on count five, the Blekhman loan charge; (4) the denial of a new trial based on the government's "gut" references during its closing argument; (5) the denial of a new trial based on "newly discovered evidence"; (6) a sentencing enhancement for obstruction of justice; (7) a sentencing enhancement for the use of sophisticated means to conceal the fraud; (8) the district court's calculation of loss attributable to the fraud; and (9) the district court's restitution order. We discuss these challenges in that order. For sake of clarity as to the appropriate standard of review, the issues are organized according to whether they were raised via motion or objection.

Before turning to the merits, a word must be said on the lack of effectiveness of making so many claims of error. "[O]ne of the most important parts of appellate advocacy is the selection of the proper claims to urge on appeal." *Howard v. Gramley*, 225 F.3d 784, 791 (7th Cir. 2000) (admonishing a

"'kitchen sink' approach" to advancing issues on appeal).[1] The claims chosen should be few and carefully measured for maximum effect. A circumspect approach boosts credibility, while raising every conceivable challenge on appeal can dilute the persuasiveness of plausible arguments. For these reasons we have cautioned: "[A] brief that treats more than three or four matters runs a serious risk of becoming too diffused and giving the overall impression that no one claimed error can be very serious." *Practitioner's Handbook for Appeals to the United States Court of Appeals for the Seventh Circuit* 139 (2019); *Hussein v. Oshkosh Motor Truck Co.*, 816 F.2d 348, 359 (7th Cir. 1987) (quoting same). Tempting as it may be to call foul on every perceived trial error, that strategy generally produces diminishing returns. "Legal contentions, like the currency, depreciate through over-issue." Robert H. Jackson, *Advocacy Before the Supreme Court*, 37 CORNELL L.Q. 1, 5 (1951). With that said, we proceed to Friedman's nine claims.

### A. Motion to Dismiss the Indictment

Recall that as Friedman and Bilis's scheme began to unravel, they jointly retained Steinback "in connection with their business." The joint-counsel engagement was brief, as Friedman obtained his own lawyer around two months later. Nearly four years after that, Friedman was indicted. Steinback

---

[1] This is a time-honored tenet of advocacy. *See generally* ANTONIN SCALIA & BRYAN A. GARNER, MAKING YOUR CASE: THE ART OF PERSUADING JUDGES 22–23 (2008) ("The most important—the very most important—step you will take … before a trial court or an appellate court, is selecting the arguments that you'll advance."); MARCUS TULLIUS CICERO, DE INVENTIONE 345 (H.M. Hubbell trans., Harvard Univ. Press 1949) (describing the selection of arguments as "the first and most important part of rhetoric").

continued to represent Bilis, who went on to plead guilty and cooperate with the government. Friedman moved to dismiss the indictment, claiming he shared privileged communications with Steinback during the short joint representation. On appeal Friedman insists that Steinback's continued representation of Bilis infected the prosecution and deprived his due process right to a fair trial. We review de novo the denial of a motion to dismiss an indictment, *United States v. Hernandez-Perdomo*, 948 F.3d 807, 810 (7th Cir. 2020), and the court's factual findings for clear error, *United States v. Boyce*, 742 F.3d 792, 794 (7th Cir. 2014).

Because "[t]he attorney-client privilege is a testimonial privilege," "so long as no evidence stemming from the breach of the privilege is introduced at trial, no prejudice results." *United States v. White*, 970 F.2d 328, 336 (7th Cir. 1992). Friedman concedes he "could not identify any communications from Steinback to Bilis, or in turn from Bilis to the government" suggesting a breach. Without that evidence, Friedman maintains the district court "should have presumed that confidences were shared." Even if true, Friedman acknowledges this presumption is rebuttable. We conclude it was thoroughly rebutted during the district court's evidentiary hearing on the issue.

To address Friedman's concerns, the district court held a closed evidentiary hearing at which Friedman and Steinback testified. On direct examination, Friedman's counsel never elicited, and Friedman never testified, that he shared any confidences with Steinback about the alleged fraud. When Friedman was asked whether he shared communications about the fraud with Steinback, Friedman responded, "in a way." But Friedman never explained what privileged communications

were exchanged, despite the district court's offer of ex parte and in camera opportunities to do so.

The exclusive setting in which the purportedly privileged communications were conveyed—during infrequent and unpredictable Bilis bathroom breaks—is not credible. Friedman's explanation also changed during the hearing; first, he testified Steinback was too expensive for idle chat, then he said those chats were saved for things he did not want Bilis to hear. That Friedman did not ask Steinback to keep those personal confidences from Bilis—with whom he entered a joint representation arrangement—further supported the unlikelihood that Friedman shared such confidences. Friedman recognized the line between personal and mutual confidences, as shown by Friedman's prompt decision to retain independent counsel without Steinback telling him to do so. All this occurred almost four years before the government issued Friedman's indictment. The record supports the district court's finding that "Friedman did not provide Steinback with any personal, privileged confidences," rebutting Friedman's presumption otherwise.

Friedman challenges the district court's credibility findings, arguing the court should have disregarded Steinback's testimony. But "[d]etermining witness credibility is especially within the province of the district court and can virtually never be clear error." *United States v. Austin*, 806 F.3d 425, 431 (7th Cir. 2015) (internal quotation marks and citations omitted). And Friedman's criticisms of Steinback's testimony are unconvincing. First, he complains Steinback did not initially inform the government that Bilis and Friedman paid a $30,000 retainer, and that Steinback applied $25,000 of it during the joint representation arrangement. Friedman calls this a

"glaring omission." Yet he offers no explanation how or why the failure to tell the government that Bilis and Friedman paid a retainer has any bearing on Steinback's credibility. Regardless, Steinback testified about the retainer during the evidentiary hearing and Friedman cross-examined him on the subject. Friedman also criticizes Steinback's mistake in recalling the location of his initial meeting with Bilis and Friedman (Rockford versus Chicago). As the district court noted, however, Steinback also testified it was "possible" they had first met elsewhere. In the end, the district court was "best situated to make credibility determinations in light of the totality of the evidence, including the witness's statements and behavior, other witness statements, and further corroborating or contrary evidence." *Id*. Friedman cannot point to a clear error by the district court in crediting Steinback's testimony over his own.

Because Friedman has not shown that any privileged communications were ever shared—let alone that any breach of privilege affected his trial—he has not shown error in the district court's denial of his motion to dismiss the indictment.

## B.  Objections to Jury Instructions

Friedman challenges two jury instructions: (1) an "aiding and abetting" instruction, which tracked Seventh Circuit pattern instruction 5.06(a); and (2) an "acting through another" instruction, which tracked Seventh Circuit pattern instruction 5.06(b). In Friedman's view, these instructions "understated the mens rea element" required for the underlying bank fraud charges and "misstated the law." Friedman concedes "the defense did not object to the[se] instructional errors" at trial.

Because the alleged errors were not raised in the district court, we must decide whether Friedman has affirmatively waived or merely forfeited this challenge. "Waiver occurs when a party intentionally relinquishes a known right and forfeiture arises when a party inadvertently fails to raise an argument in the district court." *United States v. Flores*, 929 F.3d 443, 447 (7th Cir. 2019).[2] "We review forfeited arguments for plain error, whereas waiver extinguishes error and precludes appellate review." *Id*. "Although passive silence with regard to a jury instruction permits plain error review … a defendant's affirmative approval of a proposed instruction results in waiver." *United States v. LeBeau*, 949 F.3d 334, 341–42 (7th Cir. 2020) (quoting *United States v. Natale*, 719 F.3d 719, 729 (7th Cir. 2013)). This rule is "strictly applied" to affirmative expressions of approval, including "affirmative statements as simple as 'no objection' or 'no problem' when asked about the acceptability of a proposed instruction." *Id.* at 342 (quoting *Natale*, 719 F.3d at 730).

Here, Friedman twice approved the instructions he now challenges on appeal. First, he confirmed during the final pretrial conference that he had no objections to the government's proposed instructions.[3] Then, before the close of evidence, the

---

[2] Before this court decided *Flores*, the panel invoked Circuit Rule 40(e) and circulated the opinion to all judges in active service, and no judge voted to hear the case en banc. *See* 929 F.3d at 450 n.1.

[3] At the final pretrial conference, the court and Friedman's counsel had the following colloquy:

THE COURT: Jury instructions. There were no objections ---

COUNSEL: There weren't.

THE COURT: --- or counters. So, I will adopt the government's instructions without objection. … And I realize there may be issues that

district court asked the parties to reexamine the instructions for objections. After previously adopting the government's instructions wholesale, Friedman's counsel responded to this second opportunity with requests to change several instructions, including as to the elements of bank fraud. None of those requests involved the aiding and abetting or acting through another instructions, much less an objection to the validity of any pattern instruction. *See United States v. Freed*, 921 F.3d 716, 721 (7th Cir. 2019) ("Pattern instructions are presumed to accurately state the law.") Therefore, we are not simply relying on Friedman's "passive silence," *LeBeau*, 949 F.3d at 341–42, or "inadvertent[] fail[ure] to raise an argument in the district court," *Flores*, 929 F.3d at 447. By choosing to pursue changes to certain instructions and forgoing multiple chances to change others, Friedman waived other possible jury instruction challenges.

### C.  Motion for Acquittal

Federal Rule of Criminal Procedure 29 permits a defendant to move for a judgment of acquittal before the case is submitted to the jury, or even after a guilty verdict is entered, if he does not believe the evidence is sufficient to sustain a conviction. FED. R. CRIM. P. 29(a), (c)(1). Friedman first moved for judgment of acquittal under Rule 29 at the close of the government's case, which the district court took under advisement. He then renewed his Rule 29 motion after the jury

---

come up during the course that we need to add an instruction on here or there or modify a couple of them at the end. We will go through the full set again, just to make sure all of them are appropriate, before it goes to the jury.

(Final Pretrial Conf., March 16, 2018, ECF 203 at 12.)

verdict, arguing the trial evidence was insufficient to support his conviction. The district court denied this motion. On appeal, Friedman challenges only his conviction on count five, which charged that he knowingly caused American Eagle Bank to fund the Blekhman loan for the fake purchase of a 2011 Porsche Panamera.

We review de novo the denial of a defendant's motion for judgment of acquittal. *United States v. Hernandez*, 952 F.3d 856, 859 (7th Cir. 2020). When faced with a challenge to the sufficiency of the evidence, "we view the evidence in the light most favorable to the government and will overturn the jury's verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Wade*, 962 F.3d 1004, 1012 (7th Cir. 2020) (citation and internal quotation marks omitted).

To convict Friedman on count five, the government had to prove beyond a reasonable doubt: (1) there was a scheme to defraud a bank; (2) Friedman knowingly executed or attempted to execute the scheme; (3) Friedman acted with the intent to defraud; (4) the scheme involved a materially false or fraudulent pretense, representation, or promise; and (5) at the time of the charged offense the bank's deposits were insured by the Federal Deposit Insurance Corporation. *Freed*, 921 F.3d at 722. Friedman concedes the jury was properly instructed on these elements and that American Eagle was an FDIC-insured bank.

An appellant's challenge to the sufficiency of the evidence is "a nearly insurmountable hurdle," *United States v. Torres-Chavez*, 744 F.3d 988, 993 (7th Cir. 2014), which Friedman does not clear. The government produced ample evidence of

Friedman's participation in the overall fraud scheme, includ-
ing the Blekhman loan:

- Bilis testified about the scheme and corroborated
  Friedman's role in it;

- Purported borrowers testified they did not apply for
  the fraudulent loans, receive purportedly purchased
  cars from Prestige, or make payments on those loans
  as typical with legitimate loans;

- Fraudulent loan documents contained Friedman's sig-
  nature, and, as Prestige's president, Friedman pre-
  pared Prestige's loan and cash flow reports;

- Several witnesses testified that Friedman confessed to
  the fraud;

- The Porsche Panamera was exported before the sub-
  mission of Blekhman's fake loan application;

- The Porsche Panamera's loan payments were made by
  Prestige, not Blekhman;

- Prestige accepted payments from another customer
  and a floor-plan investor for the same Porsche
  Panamera; and

- Prestige never delivered the Porsche Panamera to
  Blekhman or anyone else.

The district court considered each of these facts to con-
clude that a rational trier of fact could have found Friedman
guilty on count five. Friedman, on the other hand, describes
the above facts as a "total lack of evidence regarding [his] role
in the Blekhman loan." That dearth is intensified, he believes,
because Blekhman did not testify at trial. Friedman's argu-
ments overlook that "there is nothing wrong with

circumstantial evidence of guilt" to support a fraud convic-
tion. *United States v. Memar*, 906 F.3d 652, 656 (7th Cir. 2018).
Indeed, Friedman made the same arguments to the jury and
the jury rejected them, as it was entitled to do. Friedman's trial
did not "lack" evidence of his fraudulent acts. From the evi-
dence described above, the jury reasonably inferred Fried-
man's knowledge of and involvement in the Blekhman loan
fraud.

### D. Two Motions for a New Trial

Friedman appeals the district court's denial of his two mo-
tions for a new trial. Our review of a district court's ruling on
such a motion is for an abuse of discretion. *United States v.
O'Brien*, 953 F.3d 449, 456 (7th Cir. 2020). A new trial "should
be granted only if the evidence preponderates heavily against
the verdict, such that it would be a miscarriage of justice to let
the verdict stand." *Id*. (internal quotation marks and citation
omitted). "The ultimate inquiry is whether the defendant was
deprived of a fair trial," and we must affirm "unless we have
a strong conviction that the district court erred, and the error
committed was not harmless." *United States v. Lawrence*, 788
F.3d 234, 243 (7th Cir. 2015) (citations and internal quotation
marks omitted).

#### 1. *First New Trial Motion*

We start with Friedman's conflict of interest claim, which
repackages the arguments raised in his motion to dismiss the
indictment. Those arguments fail for reasons we already ex-
plained: Friedman never showed that Steinback breached an
attorney-client privilege, so the district court appropriately
denied a new trial on these grounds.

Next, Friedman challenges the government's various "gut" references during its rebuttal closing argument. He contends those references told the jury, in effect, to ignore evidence and to decide the case based on feelings. We have explained, however, that "improper statements during closing argument rarely constitute reversible error." *United States v. Wolfe*, 701 F.3d 1206, 1211 (7th Cir. 2012). A review of such comments involves two steps. First, we consider whether the challenged remark was improper, and second, whether the remark deprived Friedman of a fair trial. *Id*. On this second step we consider five factors: "(1) the nature and seriousness of the misconduct; (2) the extent to which the comments were invited by the defense; (3) the extent to which any prejudice was ameliorated by the court's instruction to the jury; (4) the defense's opportunity to counter any prejudice; and (5) the weight of the evidence supporting the conviction." *Id*. at 1212 (internal quotation marks omitted).

Juries are permitted to draw upon their own life experiences and common sense in reaching their verdicts. *See, e.g.*, *United States v. Brasher*, 962 F.3d 254, 270 (7th Cir. 2020); *United States v. Durham*, 211 F.3d 437, 441–42 (7th Cir. 2000). Friedman cedes this point, arguing instead that "[g]oing with one's 'gut' is the opposite of 'common sense.'" The district court found that the government used the "gut" phrase synonymously with "common sense." Our review of the record compels the same conclusion.

The government prefaced each of its "gut" references by directly invoking common sense or plainly alluding to it. For example, the government urged the jury to "look at the evidence and your gut, your common sense." It later told the jurors to "use your common sense, check your gut, ask

yourself" why a particular witness would have testified as they did. Indeed, after Friedman's trial counsel objected to use of the term, the jury was told twice, once by government counsel and then again by the court, that by "gut," the government meant "common sense." After that, during jury instructions, the district court once more instructed the jury to use its common sense and everyday experience in weighing and considering the evidence, and to draw reasonable inferences based on the evidence alone. True, prosecutors would be wise to avoid any expression that invites confusion of the government's proof burden, including "gut" comments. But in this case the jury was repeatedly informed that Friedman must be presumed innocent and that the government bore the burden of proving him guilty beyond a reasonable doubt. Thus, even if we assume the gut remarks were improper, the district court's instructions, coupled with overwhelming evidence of Friedman's role in the fraud scheme, satisfy us that such remarks did not deprive Friedman of a fair trial. We see no abuse of discretion here.

### 2. *Second New Trial Motion*

After Friedman lost his first motion for a new trial, he moved again for a new trial based on newly discovered evidence: (1) a forbearance agreement between Bilis and American Eagle Bank related to Bilis's outstanding debt, and (2) a loan agreement between the bank and Bilis's wife. Documents related to the forbearance agreement showed that the bank agreed to not pursue the remedies it had against Bilis in exchange for monthly payments to pay down the fraudulent loans and Bilis's assistance if the bank needed information for its bankruptcy case against Friedman. As for the loan involving Bilis's wife, the bank's file contained a memorandum that

acknowledged Bilis's fraud, his restitution, and his help in obtaining a judgment against Friedman.

Friedman argues this "new" evidence shows the bank incentivized Bilis to fabricate testimony, and that Bilis and the bank failed to disclose the nature and extent of their ongoing relationship. The district court denied Friedman's motion, finding that Friedman could have discovered these documents sooner through due diligence, and that the agreements were "immaterial because they were merely impeaching and cumulative of the evidence presented to the jury."

A post-judgment motion resting on newly discovered evidence must show the additional evidence: "(1) was discovered after trial, (2) could not have been discovered sooner through the exercise of due diligence, (3) is material and not merely impeaching or cumulative, and (4) probably would have led to acquittal." *United States v. O'Malley*, 833 F.3d 810, 813 (7th Cir. 2016). Taking Friedman at his word that the evidence was discovered after trial, he knew enough underlying facts to dig deeper into Bilis's relationship with American Eagle Bank. Friedman concedes he knew before trial that "Bilis was making modest restitution payments to the bank through a settlement." Friedman also knew that Bilis and two bank witnesses were set to testify against him at trial. No one disputes that the bank kept records of its "settlement" and other arrangements with Bilis in its ordinary course of business. Nor does anyone disagree that the bank would have turned over those records in response to a simple subpoena request. The key question is whether Friedman could have discovered the additional evidence had he taken reasonable steps to do so. Because the answer is "yes," Friedman's second new trial motion fails for that reason alone.

Even if we assume otherwise, the "new" evidence was cumulative of other trial evidence. On cross-examination, Bilis explained that he was making two types of payments to American Eagle Bank: one for the fraudulent loans, and the other "for my home equity loan" involving Bilis's wife. Friedman's counsel did not follow up on the specifics of Bilis's agreements with the bank. Likewise, Friedman's counsel passed on the opportunity to discuss these arrangements when questioning the bank's witnesses. And had counsel sought those specifics, it still would not have led to an acquittal. At best, that information could have been used to impeach the credibility of Bilis and the bank witnesses, which offers little help to Friedman. "[T]ypically, newly discovered impeachment evidence does not warrant relief under Rule 33." *United States v. Reyes*, 542 F.3d 588, 596 (7th Cir. 2008). Though an exception to that rule exists where a defendant's conviction depends entirely on the uncorroborated testimony of a single unreliable witness, *see, e.g.*, *United States v. Taglia*, 922 F.2d 413, 415 (7th Cir. 1991), those are not the circumstances here. Friedman faced a mountain of evidence apart from whatever Bilis and bank executives had to offer. That evidence included testimony from victims and Prestige employees, bogus loan applications, export documents, checks, loan files, and bank records. Friedman also eagerly impeached Bilis on cross-examination, pointing out that Bilis had every reason to pin the blame on Friedman to secure a deal with the government. The district court, too, instructed the jury that "Bilis was promised a benefit in return for his cooperation with the government" and to "consider [his] testimony with caution and great care." The jury still credited Bilis's testimony on three of the five counts. For these reasons, we conclude there was no abuse of

discretion or other error in the district court's denial of Fried-
man's second new trial motion.

### E. Objections to Sentencing Enhancements

Friedman also challenges the enhancements to his sen-
tence. We review the district court's application of the sen-
tencing guidelines de novo and its findings of fact for clear
error. *United States v. Sheneman*, 682 F.3d 623, 630 (7th Cir.
2012). We will reverse a finding for clear error only when "we
are left with the definite and firm conviction that a mistake
has been committed." *Id*. (citation and internal quotation
marks omitted). A below-guidelines sentence, like the one
here, is "presumptively reasonable against an attack by a de-
fendant claiming that the sentence is too high." *United States
v. Dewitt*, 943 F.3d 1092, 1098 (7th Cir. 2019) (citation and in-
ternal quotation marks omitted).

Friedman first argues the district court erred in applying
an enhancement under U.S.S.G. § 3C1.1, which provides a
two-level offense level increase if a defendant "willfully ob-
structed or impeded, or attempted to obstruct or impede, the
administration of justice with respect to the investigation,
prosecution, or sentencing of the instant offense." Perjury is
an example of conduct warranting the enhancement for ob-
struction, *United States v. Dinga*, 609 F.3d 904, 909 (7th Cir.
2010), and the district court found there was "no question"
that Friedman falsely testified at the evidentiary hearing
about sharing of privileged information with Steinback. On
appeal, Friedman insists he shared privileged information
with Steinback during Bilis's scattered bathroom breaks, and
he again disputes the district court's credibility findings. For
reasons already discussed, Friedman's bathroom break story
is implausible, if not far-fetched. *See id*. ("To believe

[defendant's] story would require a significant stretch of the imagination."). So this enhancement was correctly applied.

Next, Friedman challenges the district court's imposition of a two-level sophisticated-means enhancement. This enhancement is appropriate when "the defendant intentionally engaged in or caused the conduct constituting sophisticated means." *United States v. Muresanu*, 951 F.3d 833, 840 (7th Cir. 2020) (quoting U.S.S.G. § 2B1.1(b)(10)(C)). When determining whether a defendant employed sophisticated means, courts consider "the level of planning or concealment in relation to typical fraud of its kind." *United States v. Harris*, 791 F.3d 772, 781 (7th Cir. 2015); *United States v. Anobah*, 734 F.3d 733, 739 (7th Cir. 2013) (considering same and affirming application of sophisticated means enhancement where scheme spread over two states, used false documents, false loan applications, and false documents to support the misinformation contained in the loan applications).

The district court found that Friedman's fraud exceeded the garden-variety scheme to commit bank fraud. It included: selling single cars to multiple purchasers; orchestrating fictional car buyers to obtain loans; assuming loan payments for bogus debtors; manipulating floor-plan investors; misappropriating personally identifiable information belonging to family, friends, and former customers; and covering all that up over a span of three years, as opposed to one or two fake loan applications. Friedman insists that loan applications contained "the most basic lies." But the facts are to the contrary. His fraud went far beyond simple falsities. Those lies included the creation of phony corporate resolution documents, the misuse of driver's licenses from prior legitimate loans, and the use of already-exported cars as collateral to secure cash to

conceal the fraud. Friedman also argues that "international shipping had long been a part of Prestige's business model," suggesting the fraud was not as complex as it seems. But that only reinforces a finding of sophistication. "[A] district court need only find by a preponderance of the evidence facts sufficient to support the enhancement." *United States v. Sewell*, 780 F.3d 839, 848 (7th Cir. 2015). Friedman exploited his proficiency with international shipping practices to secure loans without collateral, distinguishing his fraud from typical bank fraud. So, the district court did not err in applying this enhancement.

### F.  Objections to Loss Calculation and Restitution

Finally, Friedman challenges the district court's loss calculation of $4,722,347 and its order of restitution in that amount. We review findings of loss amounts for clear error. *United States v. White*, 883 F.3d 983, 986 (7th Cir. 2018), and will reverse only if we are left with the definite and firm conviction that a mistake has been committed, *United States v. Orillo*, 733 F.3d 241, 244 (7th Cir. 2013).

In calculating the loss amount, the district court included losses suffered by floor-plan investors, which totaled around $2.5 million. Friedman argues the floor-plan investors' losses should be excluded from the loss amount and restitution award. The way he sees it, defrauding the floor-plan investors was separate from bilking the banks. The district court disagreed, explaining the entire reason Prestige could "keep[] the business afloat" was by concealing the bank fraud, and that a key part of that scheme was "seeking more funding" from floor-plan investors. Nor would those investors continue their investments had they known they were pumping cash into a fake inventory from a dealership that survived on fraudulent

loans. The court analogized the scheme to "musical chairs," in which money comes in from defrauded investors to pay off defrauded banks.

On appeal Friedman contends the district court based its loss findings on speculation and made no specific findings that the investors' loss amount was attributable to Friedman. We disagree, and conclude the record firmly supports the district court's finding that the solicitation, acceptance, and use of floor-plan investor funds kept Prestige afloat and the fraud concealed for over three years. Friedman asks too much of the district court. When calculating loss for sentencing, the court "must conclude that it is more likely than not that the amount in question is correct," and "a reasonable estimate suffices." *United States v. Bogdanov*, 863 F.3d 630, 634 (7th Cir. 2017). Friedman does not dispute the loss amount suffered by investors. He merely challenges the incorporation of those losses into his loss calculation. Because the record amply supports that Friedman used the investors' proceeds to pay down the fraudulent loans, we find no error in the district court's loss calculation.

Friedman's brief attack on the restitution order fails for the same reasons. That order is reviewed for abuse of discretion, *United States v. Corrigan*, 912 F.3d 422, 430 (7th Cir. 2019), viewing the evidence in the light most favorable to the government, *United States v. Yihao Pu*, 814 F.3d 818, 829 (7th Cir. 2016). Friedman acknowledges that the Mandatory Victims Restitution Act requires restitution to a victim "directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern," including bank fraud. *See* 18 U.S.C. § 3663A(a)(1)–(2), (c)(1)(A)(ii). He merely reiterates his argument that the evidence at sentencing was insufficient

to show the floor-plan investors' losses were caused by the bank fraud scheme. Viewing the evidence in the light most favorable to the government, we disagree. The same record evidence and findings that supported the district court's loss calculation also support the restitution award.

### III. Conclusion

Finding no merit in any of Friedman's claims, his conviction and sentence for bank fraud are AFFIRMED.